**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 29, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 11-1408 |
| MARK ROSALEZ, | |
| Defendant-Appellant. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 11-1406 |
| JUAN MARTIN RUELAS, | |
| Defendant-Appellant. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff-Appellee, | |
| v. | No. 11-1404 |
| JUSTIN HERNANDEZ, | |
| Defendant-Appellant. | |

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:09-CR-00301-JLK)**

Peter R. Bornstein of Peter R. Bornstein Law Office, Greenwood Village, Colorado, for Defendant-Appellant, Mark Rosalez.

Elizabeth L. Harris, (Sudee M. Wright, with her on the briefs), of Husch Blackwell, LLP, Denver, Colorado, for Defendant-Appellant, Juan Martin Ruelas.

Lisa Fine Moses of Knight & Moses, Littleton, Colorado (Antony M. Noble of the Noble Law Firm, LLC, Lakewood, Colorado, with her on the briefs), for Defendant-Appellant, Justin Hernandez.

Hayley Reynolds, Assistant United States Attorney, (John F. Walsh, United States Attorney, and Patricia Davies, Assistant United States Attorney, with her on the consolidated brief), for Plaintiff-Appellee.

Before **BRISCOE,** Chief Judge, **MATHESON**, Circuit Judge, and **JOHNSON**, District Judge[*].

**BRISCOE**, Chief Judge.

Defendants Mark Rosalez, Juan Ruelas, and Justin Hernandez, all of whom were federal inmates at the time of the underlying crimes, were jointly tried and convicted by a jury of conspiracy to assault another inmate, in violation of 18 U.S.C. § 371, and murder in the second degree, in violation of 18 U.S.C. §§ 1111(a) and 2(a). All three of the defendants were sentenced to lengthy terms of imprisonment as a result of these convictions. Each defendant now appeals his convictions. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment in each appeal.

---

[*] The Honorable William P. Johnson, United States District Judge, District of New Mexico, sitting by designation.

# I

## *Factual background*

On the morning of December 29, 2008, officials at the Federal Correctional Institution in Florence, Colorado (FCI-Florence) found inmate Pablo "Canicas" Zuniga-Garcia (Zuniga) dead in his cell. Zuniga's body was lying on the cell floor, partially covered with a mattress. Blood was spattered around the cell from floor to ceiling. An autopsy of Zuniga's body established that Zuniga had sustained approximately twenty-eight lacerations to his head caused by blunt force trauma, a fractured nose, broken teeth, a fractured middle left finger, and numerous other abrasions, contusions, and bruises. Zuniga was so severely beaten that dental records were used to confirm his identity. The cause of death was determined to be an accumulation of blows to Zuniga's head. In short, Zuniga was beaten to death.

A subsequent investigation by the Federal Bureau of Investigation and Bureau of Prison officials revealed the following facts. Zuniga was a member of the Sureños, an Hispanic prison gang. The leader of that gang at FCI-Florence, otherwise referred to by gang members as the "shot-caller" or "llavero," was an inmate named Justin "Jay" Hernandez. In the weeks and days preceding Zuniga's death, Hernandez and Zuniga had argued over an unidentified matter and Zuniga had apparently questioned Hernandez's authority. Hernandez, believing that Zuniga had disrespected him, decided that Zuniga needed to receive a "beat down" from other Sureños members. Consequently, Hernandez, with the help of defendant Mark Rosalez, who was Zuniga's cellmate and the

3

Sureños member in charge of the Pueblo Bravo housing unit where Zuniga was housed (and was effectively Hernandez's lieutenant), recruited four Sureños gang members, Jose Pluma, Daniel Morones, Rafael Alvarado, and Francisco Vasquez-Duran, to carry out the beating and two other Sureños members, Juan Ruelas and Victor Gonzalez, to act as lookouts during the beating. According to Alvarado, Hernandez stated that he wanted Zuniga "hurt bad, bad enough that he would . . . get a medical transfer" out of FCI-Florence. Trial Tr. at 1998.

Per the instructions of Hernandez and Rosalez, the beating was carried out in the following manner. On the evening of Sunday, December 28, 2008, the four inmates who were to carry out the beating (Pluma, Morones, Alvarado, and Vasquez-Duran) were provided with combination locks which were tied to fabric belts. When the individual cell doors in the Pueblo Bravo and Alpha housing units were unlocked early the following morning at approximately 6:00 a.m., Rosalez, Alvarado, and Vasquez-Duran met in the cell of Vasquez-Duran. They were subsequently joined there by Morones and Pluma, both of whom resided in the Pueblo Alpha housing unit. Pluma, Morones, Alvarado, and Vasquez-Duran then walked directly to, and entered, Zuniga's cell. Ruelas and Gonzalez, the other two Sureños members recruited to assist, waited outside of Zuniga's cell to watch for correctional officers. Ruelas positioned himself directly outside of Zuniga's cell door, while Gonzalez positioned himself on a lower floor, but within sight of Ruelas.

Immediately prior to the attack, Zuniga was alone in his cell. Morones, who entered the cell first, swung his padlock and hit Zuniga in the face or head. Zuniga

4

attempted to fight back, but the four attackers all began to hit him with their padlocks. Alvarado's padlock broke after a few blows, so Alvarado proceeded to grab or "hug" Zuniga around the torso while the other three attackers (Pluma, Morones, and Vasquez-Duran) continued to strike Zuniga with their padlocks. At some point, Zuniga slid down to the floor and Alvarado and Vasquez-Duran said to Morones and Pluma, "that's it, ya estuvo, that's enough." Id. at 2443. Zuniga also said in Spanish, "Ya estuvo," meaning that's enough. Id. But Morones said in response, "no, that's not. He [Zuniga] hasn't had enough yet." Id. In turn, Morones and Pluma continued to beat Zuniga, and Morones also stabbed at Zuniga with a mop handle. Zuniga did not fight back. Alvarado and Vasquez-Duran ultimately left Zuniga's cell and attempted to dispose of their bloody clothing. When they left the cell, Zuniga was still breathing and making sounds. Several minutes later, Morones and Pluma left Zuniga's cell and returned to the Pueblo Alpha housing unit.

The two inmates who served as lookouts, Gonzalez and Ruelas, left the Pueblo Bravo housing unit after the assault and went to the cafeteria. There, they sat with Rosalez, who asked them "if everything was good." Id. at 2845. Ruelas, who had been positioned directly outside of Zuniga's cell during the attack, and who had looked into the cell twice during the attack, responded, "I think he's gone. I think he's dead." Id. at 2848.

After Zuniga's body was discovered later that morning, the entire facility was locked down so that prison and FBI officials could investigate and search for evidence.

5

As part of this investigation, prison officials conducted "body checks" of inmates to determine who might have been involved in the attack. Id. at 847. Vasquez-Duran had swelling from the middle to little fingers on his left hand, redness on the middle finger of his right hand and associated knuckle, bruising to the center of his right shoulder blade, and bruising to the back of both of his hips. Alvarado had a vertical laceration to the upper lip on his left side, a contusion inside his upper lip, bruising around his right eye, multiple contusions on the back of his right hand, bruising to the back of his left hand, scratches on his left forearm and the right side of his lower jaw, and an abrasion to his right knee. Pluma was found to have a round red mark on one side of his ribs. Additionally, Pluma had scratches on his right shoulder blade, some redness on his right big toe, and redness on the knuckles of his left hand. Lastly, Morones was found to have abrasions on the knuckles of his left hand and the base of his right hand on the back side, as well as a minor contusion inside of his upper lip, all of which appeared to be fresh.

Prison officials also, as part of the investigation, examined video footage from the Pueblo Bravo and Alpha housing units. The video footage did not capture the actual attack, since that occurred inside of Zuniga's cell. But the video footage did show the four attackers (Pluma, Morones, Alvarado, and Vasquez-Duran) entering and subsequently exiting Zuniga's cell, and it also showed the actions of the two lookouts (Ruelas and Gonzalez).

Numerous items of physical evidence were collected by prison officials. For example, in the cell belonging to Alvarado and Ruelas, prison officials found: a nasal

6

spray bottle that had liquid detergent in it; a pair of boots that were damp and had a red spot on them resembling blood; a wet t-shirt; wet boxer shorts; and a foul-weather coat with wet pockets and gloves in it. Similarly, in the cell belonging to Morones, prison officials found: a pair of boots with blood on them; a pair of damp dishwashing gloves with blood on them; a damp towel with possible blood spots on it; and a shirt that had red stains on it that appeared to be blood spots. Additional items of bloody clothing were found in a trash can located between the Pueblo Alpha and Pueblo Bravo housing units.

Forensic lab testing also produced incriminating evidence. For example, a mop handle found in Zuniga's cell had fingerprints on it that matched known fingerprints from Morones. Further, DNA analysis of various items tied Alvarado to one of the jackets and one of the sets of boxer shorts found in the trash, and also tied Vasquez-Duran to another jacket found in the trash. And the boots found in Morones's cell had blood on them that matched the DNA of Zuniga.

*Procedural background*

On October 7, 2009, a federal grand jury returned a superseding four-count indictment against Morones, Pluma, Ruelas, Rosalez, and Hernandez. Count 1, which charged all five defendants with conspiracy, alleged that the defendants "knowingly conspired with one another and others known and unknown to the Grand Jury to commit . . . the assault of . . . Zuniga," in violation of 18 U.S.C. § 371. Dist. Ct. Doc. 99, at 1 (Superseding Indictment, filed on 10/7/99). Count 2, which charged all five defendants with second-degree murder, alleged that Morones and Pluma "unlawfully and with malice

7

aforethought . . . did kill . . . Zuniga . . . and did intentionally aid and abet one another . . .

in the commission of the offense, and [that] defendants . . . RUELAS, . . . ROSALEZ, and

. . . HERNANDEZ did intentionally aid, abet, counsel, command, induce and procure the

commission of the offense," all in violation of 18 U.S.C. §§ 1111(a) and 2(a). Id. at 4.

Count 3 charged Morones and Pluma with possession of contraband in prison, i.e.,

"padlocks attached to belts," in violation of 18 U.S.C. §§ 1791(a)(2) and (b)(3). Count 4

charged Morones with attempted escape from FCI-Florence on April 9, 2009, in violation

of 18 U.S.C. § 751(a).

In November 2009, Morones filed a motion to sever his trial from that of the other

defendants. The district court granted that motion on September 27, 2010.[1] The joint

trial of defendants Rosalez, Hernandez, Ruelas, and Pluma began in May 2011. At the

conclusion of all the evidence, the jury convicted these defendants on each of the counts

alleged against them in the superseding indictment.

Defendants were sentenced on August 25, 2011. Each of them received a sentence

of 60 months' imprisonment on Count 1. As to Count 2, Hernandez received a sentence

of 480 months' imprisonment; Rosalez received a sentence of 300 months' imprisonment;

and Ruelas received a sentence of 240 months' imprisonment. The sentences were

ordered to run concurrently with each other. But the sentences imposed on Hernandez

---

[1] Morones was separately tried and convicted of Counts 1 through 3 (Count 4 was ultimately dropped by the government). He has since filed a direct appeal challenging his convictions and sentence. See United States v. Morones, No. 11-1580 (10th Cir. filed Dec. 29, 2011).

and Rosalez were ordered to run consecutively to the federal sentences they were already serving.

## II

## A. Rosalez's appeal - No. 11-1408

Rosalez, in his direct appeal, asserts two general challenges to his conviction for murder in the second degree.[2]  First, Rosalez challenges the district court's instructions to the jury regarding coconspirator and accomplice liability for murder in the second degree. Second, Rosalez argues that his conviction for murder in the second degree must be vacated and the case remanded for a new trial on that charge due to a constructive amendment and fatal variance between the superseding indictment and the government's evidence.  We address these issues in order.

*1) Instructional error - murder in the second degree*

In addressing Rosalez's challenges to the coconspirator and accomplice liability instructions, we "review de novo the jury instructions as a whole and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case."  United States v. Rosemond, 695 F.3d 1151, 1154 (10th Cir. 2012) (internal quotation marks omitted).

---

[2] We again note here that Rosalez was Zuniga's cellmate and was not physically present when his cohorts attacked and killed Zuniga.

9

*a) The district court's instructions*

The district court gave the jury three related instructions, Instruction Nos. 19, 20, and 21, that discussed the concepts of coconspirator and accomplice liability. Those three instructions provided as follows:

INSTRUCTION NO. 19

**Coconspirator Liability**

The law holds each member of a conspiracy legally responsible for any crimes committed by another coconspirator if those crimes (1) were within the scope of the conspiracy; or (2) were reasonably foreseeable as a necessary or natural consequence of the unlawful agreement.

If you find a defendant guilty of the conspiracy charged in Count 1, the conspiracy to assault Pablo Zuniga-Garcia, and you find beyond a reasonable doubt that during the time the defendant was a member of the conspiracy another coconspirator committed the murder in the second-degree charged in Count 2, and the murder was committed to achieve an objective of, or was a foreseeable consequence of the conspiracy to assault Pablo Zuniga-Garcia, then you may find the defendant guilty of Count 2, murder in the second-degree, even though the defendant may not have participated in any of the acts which constitute the offense described in Count 2.

Rosalez Supp. App, Vol. 2, at 45.

INSTRUCTION NO. 20

**Aiding and Abetting - Accomplice Liability**

If you determine that a defendant did not personally commit the murder charged in Count 2, he may still be legally responsible for the murder as an accomplice, otherwise known as an aider and abetter [sic].

The guilt of the defendant in a criminal case may be established without proof that the defendant did every act constituting the offense alleged. The law requires that, ordinarily, anything a person can do for himself may also be

10

accomplished by that person through the direction of another person acting as his or her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

So, if another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, the law holds the defendant responsible for the acts and conduct of such person just as though the defendant had committed the acts or engaged in such conduct.

Notice, however, that before any defendant may be criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

Mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator. In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law. Participation in the criminal venture may be established by circumstantial evidence and the defendant's level of participation may be of a relatively slight moment.

Count 2, murder in the second-degree, charges defendant JOSE AUGUSTIN PLUMA with intentionally aiding and abetting others in the commission of the murder. Count 2 also charges defendants JUAN MARTIN RUELAS, MARK ROSALEZ, and JUSTIN HERNANDEZ with intentionally aiding, abetting, counseling, commanding, inducing, and procuring the commission of the offense.

In order to be found guilty as an "aider and abetter [sic]", the government must prove:

> *First*: that the defendant associated himself with a criminal venture;

> *Second*: that he participated in the venture as in something that he wished to bring about;

11

*Third*: that he sought by his actions to make the venture succeed; and

*Fourth*: someone other than the defendant committed the offense with the aid of the defendant.

Id. at 46-47.

## INSTRUCTION NO. 21

### Difference between "aiding and abetting" and conspiracy

Aiding and abetting and coconspirator liability are alternative theories by which the Government may prove a defendant's criminal liability for a charged offense. Sometimes jurors have difficulty understanding the legal difference between the criminal offense of "conspiracy" and "aiding and abetting." "Conspiracy" depends and is based on any agreement, unspoken or expressed, whether carried over into a conspiratorial act or not; whereas "aiding and abetting" depends on a showing of conscious participation in a criminal act, *i.e.*, knowingly assisting in the performance of the criminal act charged. It is the element of "agreement" that distinguishes conspiracy from aiding and abetting.

Id. at 48.

The district court's jury instructions also included the following detailed instruction on murder in the second degree:

## INSTRUCTION NO. 18

### Murder in the Second Degree - Count 2

The defendants JOSE AUGUSTIN PLUMA, JUAN MARTIN RUELAS, MARK ROSALEZ, and JUSTIN HERNANDEZ are charged in Count 2 with a violation of 18 U.S.C. sections 1111(a) & 2(a).

This law makes it a crime to unlawfully kill a human being with malice aforethought.

To find the defendant guilty of this crime, you must be convinced that the government has proved beyond a reasonable doubt:

12

*First*: the defendant caused the death of the victim named in the indictment.

*Second*: the defendant killed the victim with malice aforethought.

*Third*: the killing took place within the territorial jurisdiction of the United States.

To kill "with malice aforethought" means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life. To find malice aforethought, you need not be convinced that the defendant hated the person killed, or felt ill will toward the victim at the time.

In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument, and the manner in which death was caused.

It is not necessary for the government to prove that the defendant acted with premeditated intent to kill. Premeditation is typically associated with killing in cold blood, and requires a period of time in which the accused deliberates or thinks the matter over before acting.

You are instructed that the alleged murder occurred within the territorial jurisdiction of the United States if you find beyond a reasonable doubt that such offense occurred in the location described in the indictment.

### Unanimity of Theory

The government has two alternative theories for finding the Defendants guilty of Count 2: co-conspirator liability and aiding and abetting liability. In order to return a guilty verdict all twelve of you must agree on which theory, if any, the government has proven beyond a reasonable doubt.

Id. at 43-44.

### b) Rosalez's challenge to Instruction No. 20

Rosalez argues that Instruction No. 20 "was erroneous because it did not properly

incorporate that aiding and abetting, pursuant to Tenth Circuit case law construing 18

13

U.S.C. § 2, requires proof beyond a reasonable doubt that a party acted with specific intent." Rosalez Op. Br. at 25. Although Rosalez concedes that "the language in Instruction No. 20 was approved" by this court in United States v. Yazzie, 188 F.3d 1178 (10th Cir. 1999), he asserts "the instruction was not appropriate" in his case because he did not "share[] the same conscious objective," or the "same *mens rea*[,] as the principals whom [he] may have believed would assault, but not kill, Zuniga." Id. at 26. In other words, Rosalez argues that although the evidence presented at trial may have established that he "had the specific intent to aid principals in committing an assault," it did not establish that he had "the specific intent to commit a homicide." Id. Rosalez also asserts, citing the decision in United States v. Woody, 250 F. App'x. 867 (10th Cir. 2007), that "the jury should have been instructed that the government had to prove beyond a reasonable doubt that [he] intended to bring about *the result* committed by the other principals."[3] Rosalez Op. Br. at 27-28 (emphasis in original).

Although the facts at issue in this case are obviously different from those at issue in Yazzie, the legal principles relevant to establishing aiding and abetting liability in both cases are the same. For an aiding and abetting conviction, the Government must prove that the defendant (1) "willfully associate[d] himself with the criminal venture" and (2) sought "to make the venture succeed through some action of his own." United States v. Jackson, 213 F.3d 1269, 1292 (10th Cir. 2000), judgment vacated on other grounds 531

---

[3] Tenth Circuit Rule 32.1 provides, in pertinent part, that "[u]npublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

14

U.S. 1033 (2000); see also Nye & Nissen v. United States, 336 U.S. 613, 619 (1949) ("[T]o aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'"). There must be "some showing of intent to further the criminal venture." United States v. Delgado-Uribe, 363 F.3d 1077, 1084 (10th Cir. 2004). "Mere presence at a crime scene" or knowledge alone that "a crime is being committed" is insufficient. Id. "[A] defendant must share in the intent to commit the underlying offense." United States v. Willis, 476 F.3d 1121, 1125 (10th Cir. 2007).

Consistent with our precedent, Instruction No. 20 correctly instructed the jury that it could only find Rosalez guilty as an "aider and abetter [sic]" if the government proved (1) he "associated himself with a criminal venture;" (2) "he participated in the venture as in something that he wished to bring about;" (3) he sought by his actions to make the venture succeed; and (4) the principal "committed the offense with the aid of the defendant." In other words, Instruction 20 encompassed all relevant elements of our court's precedent on aiding and abetting law, requiring the jury to find that Rosalez shared in the "intent to commit the underlying offense," "willfully associated with the criminal venture," and "aided the venture through affirmative action."

Contrary to Rosalez's assertion, our unpublished decision in Woody did not require the district court in this case to instruct the jury "that the government had to prove beyond a reasonable doubt that Rosalez intended to bring about *the result* committed by

15

the other principals." Rosalez Op. Br. at 27-28 (emphasis in original). Indeed, there was no challenge to the instructions in Woody, and it is unclear precisely how the jury in that case was instructed. More importantly, Rosalez's argument overlooks the portion of Woody which notes that the specific intent requirement necessary to impose aiding and abetting liability is satisfied if the defendant participated in the crime "reasonably expecting" that it would bring about the death of the victim.

In this case, Instruction No. 20 advised the jury, in pertinent part, that they could not find Rosalez guilty under an aiding and abetting theory unless they found "beyond a reasonable doubt that every element of the offense [of murder in the second degree] was committed by some person or persons, and that [Rosalez] voluntarily participated in its commission with the intent to violate the law." Rosalez Supp. App., Vol. 2, at 47. In turn, Instruction No. 18 outlined for the jury the essential elements of the offense of murder. Key among those requirements was that Zuniga was "killed . . . with malice aforethought," meaning "either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." Id. at 43. Considered together, Instruction Nos. 18 and 20 "accurately state[d] the governing law and provide[d] the jury with an accurate understanding of the relevant legal standards," Rosemond, 695 F.3d at 1154, for determining whether to hold Rosalez liable for murder in the second degree as an aider and abettor.

Thus, in sum, we conclude that Instruction No. 20, together with the other instructions, correctly educated the jury about the law regarding aiding and abetting

16

liability.[4]

*c) Should the jury have been instructed on coconspirator liability?*

Instruction No. 19, as we have noted, outlined for the jury the concept of coconspirator liability.  In <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946), the Supreme Court explained the basic notion behind coconspirator liability:

> An overt act is an essential ingredient of the crime of conspiracy . . . .  If that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense.

<u>Id.</u> at 647.  The Supreme Court also outlined possible limitations on such liability:

> A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

<u>Id.</u> at 647-48.

Rosalez argues that Instruction No. 19 was erroneous because a coconspirator liability instruction should not have been given at all.  In support, Rosalez asserts that the goal of the underlying conspiracy was to assault Zuniga, and that "[w]hen the co-conspirators entered the jail cell and initially began assaulting Zuniga[], the conspiracy accomplished its goals."  Rosalez Op. Br. at 35.  In other words, Rosalez asserts, "[a]t that point, the conspiracy ended and liability for what occurred once the assault was

_____

[4] We need not address whether the jury had sufficient evidence to find Rosalez guilty of aiding and abetting second degree murder because that question is not before us.

17

accomplished, *i.e.*, continued beating that ultimately caused the death [of Zuniga], cannot be imputed to Rosalez as a matter of law." Id.

We disagree. The evidence presented by the government at trial overwhelmingly established that the purpose of the conspiracy, as outlined by Sureños leader Hernandez, was to beat Zuniga severely enough that he would have to be removed from his cell on a stretcher and taken to a different facility. Obviously, that objective would not, as suggested by Rosalez, have been accomplished at the outset of the beating.

Relatedly, the superseding indictment in this case charged the defendants with knowingly conspiring with one another to commit the assault of Zuniga. Consistent with that allegation, Jury Instruction No. 17 explained to the jury, in pertinent part, that "[t]he term 'assault' means to intentionally hit, strike, wound or otherwise inflict injury upon someone else, or threaten to inflict injury upon someone else coupled with an apparent ability to do so." Rosalez Supp. App., Vol. 2, at 39. Applying that definition to the evidence presented at trial, it is apparent that the "assault" on Zuniga did not end either when the assailants first entered Zuniga's cell and began the beating, or at the moment that Alvarado and Vasquez-Duran ceased participating in the beating and left Zuniga's cell. That is because two of the coconspirators, Morones and Pluma, remained in Zuniga's cell and continued to beat Zuniga. Consequently, the evidence presented at trial would have allowed the jury to reasonably find that the conspiracy continued until such time as Morones and Pluma ceased their beating of Zuniga, and that the beating in fact did not cease until Zuniga was dead. In other words, there was more than sufficient

18

evidence to allow the jury to find that the continued beating performed by Morones and Pluma "was in execution of the enterprise," and thus the conspiracy continued until those acts were completed. Pinkerton, 328 U.S. at 647. Consequently, given this evidence, we conclude that the district court acted properly in instructing the jury on coconspirator liability, as outlined in Instruction No. 19.

Rosalez also argues, citing this court's decision in United States v. Cherry, 217 F.3d 811 (10th Cir. 2000), that subjecting him to coconspirator "liability to cover crimes removed from the original object of the conspiracy would be incompatible with due process." Rosalez Op. Br. at 36. In Cherry, we suggested that it would be "incompatible with the due process limitations inherent in Pinkerton" for a "minor drug distribution co-conspirator, regardless of knowledge, the extent of the conspiracy, its history of violence, and like factors," to be held "liable for first-degree murder" committed by a coconspirator. 217 F.3d at 818. We explained that "[a]lthough intimidation and violence may or may not be foreseeable results of a particular drug conspiracy, first-degree murder liability incorporates a specific intent requirement far more stringent than mere foreseeability." Id. We also explained that, under Tenth Circuit law, "conspirators are responsible for crimes committed within the scope of the unlawful project and thus reasonably foreseeable as a necessary or natural consequence of the unlawful agreement." Id. at 817 (internal quotation marks and citations omitted). In addition, we noted, "[a] conspirator . . . is only liable for the acts of co-conspirators until the conspiracy accomplished its goals or that conspirator withdraws." Id. (internal quotation marks

19

omitted).

We are not persuaded, however, that holding Rosalez responsible for the acts of Pluma, Morones, Alvarado, and Vasquez-Duran is contrary to Cherry or otherwise violates the due process limitations inherent in Pinkerton. That is because the acts of those four individuals, i.e., beating Zuniga severely, were within the scope of the conspiracy and thus necessarily foreseeable to the other members of the conspiracy. Moreover, as we have already noted, the evidence presented at trial would have allowed the jury to reasonably find that the conspiracy did not end until Morones and Pluma ceased beating Zuniga. Although Rosalez now argues that it was "not a foreseeable consequence of the conspiratorial agreement" that Morones and Pluma would "continue[] to beat Zuniga[] until he was left to die," Rosalez Op. Br. at 38 (bolding and italics omitted), the government's evidence at trial established that Hernandez directed the coconspirators that he wanted Zuniga beaten to the point of having to be carried out of his cell on a stretcher. That Zuniga might die from such an assault, particularly given the number of attackers involved and the weapons involved, was in our view reasonably foreseeable. In other words, the murder of Zuniga was not an act that occurred separately from the assault, but rather was a direct, and entirely foreseeable, result of the vicious assault carried out on him.

*d) Was Instruction No. 19 fatally defective?*

Rosalez also asserts that, even if the district court did not err in instructing the jury on the concept of coconspirator liability, Instruction No. 19 was nevertheless fatally

20

defective "because it did not follow the legal requirements for vicarious liability," id. at 38, and "incorrectly stated the law of Pinkerton liability because it did not inform the jury that the substantive crime must be within the scope of and in furtherance of the conspiracy," id. at 38-39.  More specifically, Rosalez argues that Instruction No. 19's "use of the word 'or' instead of 'and' . . . erroneously allowed the jury to convict if the death was a necessary consequence, or a natural consequence, of the conspiracy . . . ."  Id. at 41.

Rosalez's arguments, however, are undermined by three related sources.  To begin with, the second paragraph of Instruction No. 19 is identical to (with the exception of one comma), and was presumably derived from, Tenth Circuit Pattern Instruction 2.21, entitled "CONSPIRATOR'S LIABILITY FOR SUBSTANTIVE COUNT."  Pattern Instruction 2.21, contrary to Rosalez's arguments in his direct appeal, requires only proof that the substantive offense "was committed to achieve an objective of or was a foreseeable consequence of th[e] conspiracy," not both.

Second, Pattern Instruction 2.21 is expressly based, in part, on this court's decision in United States v. Dumas, 688 F.2d 84 (10th Cir. 1982).  See Tenth Circuit Criminal Pattern Jury Instructions, Instruction 2.21, cmt. (2011).  In Dumas, we acknowledged, with a citation to Pinkerton, what we described as "the longstanding rule that a party to a continuing conspiracy may be responsible for substantive offenses a coconspirator commits even if the party was unaware they were going to be committed."  688 F.2d at 87.  Although Dumas does not directly address the question raised by Rosalez, it

21

nevertheless suggests that Rosalez was properly held liable for the murder of Zuniga because the murder was a foreseeable result of an offense, i.e., assault, that Rosalez knew was the direct object of the conspiracy and that was going to be carried out against Zuniga.

Third, and most decisively, our decision in United States v. Evans, 970 F.2d 663 (10th Cir. 1992), supports both Pattern Instruction 2.21 and the district court's instruction in this case. In Evans, we noted that, "[u]nder Pinkerton, a defendant is liable for any crimes committed by a coconspirator if those crimes (1) were within the scope of the conspiracy or (2) were reasonably foreseen as a necessary or natural consequence of the unlawful agreement." 970 F.2d at 678 n.20 (emphasis added).

To be sure, this court stated in United States v. Russell, 963 F.2d 1320 (10th Cir. 1992), that "conspirators are responsible for crimes committed 'within the scope of the unlawful project' and thus 'reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" Id. at 1322 (quoting Pinkerton, 328 U.S. at 647-48). But this statement from Russell was not intended to circumscribe the complete extent of coconspirator liability, nor was it intended to address the question of whether coconspirator liability extends to foreseeable, but originally unintended, crimes. Rather, the statement was simply intended to make clear, in response to the defendant's assertion that he should not be held responsible for all of the acts committed during the life of the conspiracy, that any acts committed within the scope of the conspiracy were necessarily

22

foreseeable and thus chargeable to him.[5]

Finally, we note that case law from other circuits supports the district court's instruction in this case. For example, the Second Circuit has held that, under Pinkerton, "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to the defendant as a consequence of their criminal agreement." United States v. Parkes, 497 F.3d 220, 232 (2d Cir. 2007). "An offense by a co-conspirator is deemed to be reasonably foreseeable if it is a necessary or natural consequence of the unlawful agreement." Id. at 232 (internal quotation marks omitted). And the Second Circuit has held that, in the context of armed robberies, "[t]he death of a victim is a natural consequence of a robbery which is premised on the use of overmastering force and violent armed confrontation." Id. That holding is analogous to the situation in this case, i.e., the death of Zuniga was a natural consequence of the severe beating intended and carried out by the coconspirators.

*e) Rosalez's challenge to Instruction No. 21*

Rosalez contends that Instruction No. 21, which purported to clarify the distinction between aiding and abetting liability and coconspirator liability, was fatally defective and compounded the deficiencies of Instruction Nos. 19 and 20. According to Rosalez, Instruction No. 21 "did nothing to distinguish accomplice liability from coconspirator

---

[5] Indeed, we note that Russell is expressly cited as a source upon which Pattern Instruction 2.21 was drawn. See Tenth Circuit Criminal Pattern Jury Instructions, Instruction 2.21, cmt. (2011).

23

liability," and "[a] plain reading of the instruction reveals that it makes little or no sense." Rosalez Op. Br. at 42.

Instruction No. 21, however, appears to have been based on our decision in United States v. Bowen, 527 F.3d 1065 (10th Cir. 2008). In Bowen, we explained that "[a]iding and abetting and Pinkerton co-conspirator liability are alternative theories 'by which the Government may prove joint criminal liability for a substantive offense.'" Id. at 1077 (quoting United States v. Zackery, 494 F.3d 644, 649 (8th Cir. 2007)). We further stated:

> While an agreement to break the law is an essential component of coconspirator liability, no such agreement is required to render one liable as an aider and abettor. Liability as an aider and abetter [sic] is based solely on the act of intentionally counseling, aiding, or assisting another in the commission of a crime.

Id. at 1077 n.10 (emphasis and internal citations omitted). Instruction No. 21, though not identically worded, very closely tracks this language from Bowen. Consequently, Instruction No. 21 is consistent with Tenth Circuit law. Moreover, as we have explained, neither Instruction Nos. 19 nor 20 were erroneous. Thus, the three instructions, considered together, correctly outlined for the jury the law of coconspirator and accomplice liability.

*2) Constructive amendment/fatal variance*

In his second general attack on his conviction for murder in the second degree, Rosalez argues that the district court's jury instructions, which informed the jury that they could convict Rosalez of murder in the second degree under a coconspirator theory of liability, constructively amended Count 2 of the superseding indictment (i.e., the count

24

charging Rosalez with murder in the second degree).  Alternatively, Rosalez argues that, for essentially the same reasons, there was a fatal variance between the allegations of Count 2 of the superseding indictment and the government's evidence at trial.  We review de novo the question of whether an amendment or a variance occurred.  See United States v. Bedford, 536 F.3d 1148, 1157 (10th Cir. 2008) (constructive amendments); United States v. Acosta-Gallardo, 656 F.3d 1109, 1116 (10th Cir. 2011) (variances).

"An indictment may be the subject of an actual amendment, a constructive amendment, or a variance."  United States v. Budd, 496 F.3d 517, 521 (6th Cir. 2007). "An actual amendment occurs when the prosecutor," id., or the district court, "without a resubmission to the grand jury," Salinger v. United States, 272 U.S. 542, 549 (1926), "actually changes the text of the indictment," Budd, 496 F.3d at 521.  In contrast, "[a] constructive amendment results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment."  Id. (brackets in original; quoting United States v. Smith, 320 F.3d 647, 656 (6th Cir. 2003)).  "A variance arises when" the charging terms of the indictment are unchanged, but the "evidence adduced at trial establishes facts different from those alleged in an indictment."  Acosta-Gallardo, 656 F.3d at 1116 (internal quotation marks omitted).

The gist of Rosalez's constructive amendment and fatal variance arguments is that he "was charged [in the superseding indictment] with conspiracy to commit an assault,

25

and with ***aiding and abetting*** the commission of second degree murder," but the jury instructions allowed the jury "to convict [him] of murder in the second degree under a theory nowhere pled in the Superseding Indictment, namely, a theory based on Pinkerton liability." Rosalez Op. Br. at 48 (emphasis in original). In other words, Rosalez is not alleging there was a difference between the facts alleged in Count 2 of the superseding indictment and either the evidence introduced by the government at trial or the district court's jury instructions regarding Count 2. Rather, he is asserting that Count 2 of the superseding indictment mentioned only one possible theory of liability, i.e., aiding and abetting liability, whereas at trial the government and the district court's instructions relied upon two alternative theories of liability, i.e., aiding and abetting liability and Pinkerton liability.

We conclude, contrary to Rosalez's arguments, that neither a constructive amendment nor a variance occurred in this case. To begin with, the Supreme Court has held that "aiding and abetting and Pinkerton are alternative theories by which the government may prove joint criminal liability for a substantive offense." United States v. Zackery, 494 F.3d 644, 649 (8th Cir. 2007) (citing Nye & Nissen v. United States, 336 U.S. 613, 618-20 (1949)). Further, an "indictment need not plead the government's theory of liability." Zackery, 494 F.3d at 649; United States v. Ashley, 606 F.3d 135, 143 (4th Cir. 2010) (holding that vicarious theories of liability need not be charged in an indictment); United States v. Edmond, 924 F.2d 261, 269 (D. C. Cir. 1991) ("Indictments do not recite the government's theory of proof, which is what the Pinkerton theory is.").

26

Consequently, "[e]ven in the absence of evidence supporting an aiding and abetting conviction, persons indicted as aiders and abettors may be convicted pursuant to a Pinkerton instruction." United States v. Comeaux, 955 F.2d 586, 591 (8th Cir. 1992). And, more to the point, "a district court does not constructively amend an indictment by giving a Pinkerton instruction when Pinkerton liability has not been charged by the grand jury." Ashley, 606 F.3d at 143 (citing cases from various circuits in support of this rule).

In addition to these general principles, we note that the superseding indictment in this case specifically provided Rosalez with notice that the assault of Zuniga, which was the specific object of the conspiracy, resulted in Zuniga's death. In particular, Count 1 of the superseding indictment alleged at the outset that Rosalez and his codefendants "knowingly conspired with one another and others known and unknown to the Grand Jury to commit . . . the assault of . . . Zuniga[] . . . , which assault did result in serious bodily injury and death." Dist. Ct. Doc. 99, at 1-2 (Superseding Indictment, filed on 10/7/99). Count 1 similarly alleged, in describing the specifics of the assault, that Zuniga "suffered serious bodily injury and died as a result of the assault." Id. at 3. In light of these allegations, it is apparent that the superseding indictment placed Rosalez on notice that the government might rely on a Pinkerton theory to prove his guilt on Count 2, i.e., the second-degree murder charge. And Rosalez cannot claim to have been surprised by the government's evidence at trial, which conformed precisely to the allegations in the superseding indictment.

Relatedly, Rosalez argues that the use of "the Pinkerton doctrine lessened the

27

government's burden of proof significantly by eliminating the mens rea requirement for second degree murder and by eliminating the mens rea requirement for aiding and abetting liability." Rosalez Op. Br. at 48. But this argument, which is essentially a rehash of Rosalez's attacks on the district court's jury instructions, clearly has no merit.

Lastly, Rosalez argues that "the lack of notice that the prosecution intended to proceed on the Pinkerton theory until the tendered jury instructions to the court, [sic] precluded [him] from locating and obtaining permission from the court pursuant to the Criminal Justice Act to hire and retain one or more expert witnesses" who "would have testified that a death from a disciplinary beating was not a foreseeable consequence in the federal prison system because such deaths are extremely rare generally and had never occurred in this particular institution." Id. But, as we have explained, Rosalez did, in fact, have adequate notice that the government might proceed on a Pinkerton theory at trial. And, as the government has noted, the defense at trial actually elicited testimony indicating that it was unusual for a prison beating to result in death. Thus, we conclude that expert testimony on this point would not have altered the outcome of the trial.

### B. Ruelas's appeal - No. 11-1406

Ruelas asserts two issues in his direct appeal. First, Ruelas argues that the district court plainly erred by omitting an essential element from the coconspirator liability instruction (Instruction No. 19). Second, Ruelas asserts that the district court erred in admitting his suppression hearing testimony at trial.

28

*1) Instructional error - coconspirator liability*

Ruelas argues, with respect to Instruction No. 19, that the district court erred in "instruct[ing] the jury in the disjunctive" and "allowing them to convict [him] of murder under a co-conspirator theory if the murder was *either* committed . . . within the scope of the conspiracy to assault *or* was a reasonably foreseeable consequence of the conspiracy." Ruelas Op. Br., at 17 (emphasis in original). In support, Ruelas asserts "[i]t is well-established under Supreme Court and Tenth Circuit law that co-conspirator liability requires a showing that the offense was committed within the scope of the conspiracy." Id. Because, he argues, "the conspirators' unlawful agreement serves as a substitute for intent to commit an offense," due process requires that "a conspirator . . . only be [held] liable for crimes fairly encompassed within the unlawful agreement or crimes that further the criminal objective." Id.

Because Ruelas did not assert a timely and specific objection to the district court's Pinkerton instruction, we review his arguments only for plain error. United States v. Bader, 678 F.3d 858, 867 (10th Cir. 2012). "Plain error occurs when there is (i) error, (ii) that is plain, which (iii) affects the defendant's substantial rights, and which (iv) seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. at 868 (internal quotation marks omitted).

As we have already explained in addressing Rosalez's appeal, Instruction No. 19 correctly stated the governing law regarding coconspirator liability. Thus, Ruelas cannot establish the existence of plain error and we summarily reject his claim.

29

*2) Admission of testimony from suppression hearing*

In his second issue on appeal, Ruelas argues that the district court erred in admitting at trial statements that Ruelas made during a pretrial suppression hearing.

*a) Background*

During the investigation of Zuniga's murder, Ruelas was interviewed by FBI Special Agent James Moore. Ruelas told Moore that his presence near Zuniga's cell at the time of the beating was merely coincidental. More specifically, Ruelas stated that he was walking near Cell 408 and intended to accompany Rosalez to breakfast when he saw a fight going on inside cell 408. Ruelas further stated that he closed the door to cell 408 because of the fight, and he remained outside of the cell because he wanted to see what transpired. Lastly, Ruelas stated that he did not recognize the inmates that came out of the cell after the fight, even though one of those inmates, Alvarado, was Ruelas's cellmate. According to Moore, Ruelas's description of what occurred did not match what Moore observed Ruelas doing on the prison's surveillance video.

After he was indicted in this case, Ruelas sought to suppress the statements he made to Special Agent Moore, arguing that those statements were involuntary. The focus of the ensuing suppression hearing was on the circumstances of the interview between Moore and Ruelas. Moore testified that the interview was conducted in the staff lounge at FCI-Florence and lasted for approximately 23 minutes (from 4:02 p.m. to 4:25 p.m.), that Ruelas willingly signed a waiver of rights form that was produced for the court, and that Ruelas never exhibited or complained of any discomfort during the interview. Ruelas,

30

however, testified on direct examination that he was placed in the staff lounge, with his hands handcuffed behind him, at approximately 11:30 a.m., that he remained there until the interview began at approximately 4:02 p.m., and that he complained of discomfort to the officer who was watching him.

During the government's cross-examination of Ruelas at the suppression hearing, Ruelas conceded that he knowingly and voluntarily signed the waiver of rights form. But he also made a number of clearly or presumably false statements. For example, at one point during the cross-examination he refused to admit that he was an inmate at FCI-Florence at the time of Zuniga's murder. Ruelas also claimed that he did not know who lived in cell 408, and did not know the names or nicknames of any of the inmates in or near cell 408 at the time of the beating (Moore had testified that Ruelas, during the interview, identified Rosalez by his real name, and most other inmates by their nicknames). Ruelas conceded that he did not want to identify any Sureños members as being involved in Zuniga's murder because he "didn't want it chasing [him] around the prison system [his] whole life." Dist. Ct. Doc. 342, at 83 (Tr. of Mot. Hr'g on 4/5/10). Ruelas further stated that he "only told [Moore] as much as I felt like I could tell him, and that was it." Id. at 86. Ultimately, the district court ordered Ruelas excused and "placed in contempt of court and held in solitary confinement until further notice." Id. at 100. The district court also, at the government's request, ordered Ruelas's testimony on direct examination stricken. Id.

At trial, the prosecution presented Special Agent Moore as a witness during its

case in chief. The district court, at the prosecution's request, took judicial notice of a transcript of Ruelas's testimony from his suppression hearing and allowed the prosecution, with the aid of Special Agent Moore, to read part of Ruelas's testimony from that hearing to the jury. Ruelas's counsel objected to the reading of this testimony on various grounds, but those objections were overruled by the district court.

### b) Standard of review

Although the government concedes that Ruelas asserted a timely objection to the introduction at trial of his suppression hearing testimony, it asserts that "his developed arguments and the Court's rulings were [solely] under the Federal Rules of Evidence, specifically Rules 102, 104, 401, 402, 403, and 404." Gov't Br. at 26. In other words, the government argues, "Ruelas did not preserve the self-incrimination argument he now makes on appeal," id., and the panel in this case should thus review the issue only for plain error, id. at 27.

But the government overlooks the fact that Ruelas's counsel objected, in pertinent part, on the ground that allowing the introduction of Ruelas's suppression hearing testimony would "violat[e] . . . his right to exercise the due-process right to . . . challenge a post-arrest statement." Trial Tr. at 2255. And, in response, the government argued that this case was distinguishable from Simmons v. United States, 390 U.S. 377 (1968), the sole case that Ruelas now relies on in his appeal. Trial Tr. at 2262. In light of these arguments, we conclude that the district court was, in fact, presented with the issue now raised by Ruelas, i.e., whether the admission of Ruelas's suppression hearing testimony

32

would violate Ruelas's constitutional rights.

*c) Analysis*

At the heart of Ruelas's claim is the notion that the trial court, by admitting at trial portions of Ruelas's testimony from the suppression hearing, violated Ruelas's Fifth Amendment right against self-incrimination. Although we "ordinarily review evidentiary rulings for abuse of discretion," where, as here, the defendant asserts that a ruling "violated his constitutional rights, we review the ruling de novo." United States v. DeChristopher, 695 F.3d 1082, 1095 (10th Cir. 2012).

Ruelas claims that the district court's admission of his suppression hearing statements was contrary to the Supreme Court's decision in Simmons. Simmons involved consolidated appeals from two men, Simmons and Garrett, who were charged with and convicted of armed robbery of a federally insured savings and loan association. In the district court, defendant Garrett sought to suppress incriminating evidence contained in a suitcase seized by the police from his mother's basement. In order to establish standing to challenge the seizure of the suitcase (since he was not in the house at the time of the seizure), Garrett had to testify at the suppression hearing that the suitcase was similar to one he had previously owned, and that the clothing found in the suitcase belonged to him. Garrett's motion to suppress, however, was ultimately denied. And the district court, consistent with existing circuit law, ruled that Garrett's testimony at the suppression hearing was admissible at trial against him.

On appeal, Garrett "contended that it was reversible error to allow the Government

33

to use against [him] on the issue of guilt the testimony given by him . . . establish[ing] that [he] was the owner of the suitcase." 390 U.S. at 389. The Supreme Court acknowledged the dilemma faced by Garrett in the district court, i.e., by pursuing a potentially viable Fourth Amendment claim, he risked providing the prosecution with evidence that would be relevant for purposes of proving him guilty of the charged offense. More specifically, the Court noted, "a defendant who wishes to establish standing [to seek suppression of seized evidence] must do so at the risk that the words which he utters may later be used to incriminate him." Id. at 393. And, the Court noted, "a defendant with a substantial claim for the exclusion of evidence may conclude that the admission of the evidence, together with the Government's proof linking it to him, is preferable to risking the admission of his own testimony connecting himself with the seized evidence." Id. Because the Court "f[ou]nd it intolerable that one constitutional right should have to be surrendered in order to assert another," it held "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."[6] Id. at 394.

The government asserts, and we agree, that Ruelas's situation is distinguishable

---

[6] Although Simmons has not been overruled, the Supreme Court has questioned its logic. In McGautha v. California, 402 U.S. 183, 212 (1971), vacated on other grounds by Crampton v. Ohio, 408 U.S. 941 (1972), the Court stated that "to the extent that [Simmons'] rationale was based on a 'tension' between constitutional rights and the policies behind them, the validity of that reasoning must now be regarded as open to question."

from <u>Simmons</u>. Unlike defendant Garrett in the <u>Simmons</u> case, Ruelas did not have to make any incriminating statements at the suppression hearing in this case in order to properly assert his Fourth Amendment challenge to the government's evidence (i.e., that his statements to FBI Special Agent Moore were involuntary because of the conditions under which they were given). Moreover, unlike the situation in <u>Simmons</u>, Ruelas gave patently false, evasive, and ever-shifting answers to basic questions posed by the government during the suppression hearing, thus prompting the district court to broaden the scope of cross-examination "on the basis of . . . credibility" so that it could make a final determination on the suppression issue. Trial Tr. at 2263. Thus, in sum, Ruelas was never faced with the dilemma that defendant Garrett faced in the <u>Simmons</u> case, i.e., surrendering his Fifth Amendment right to self-incrimination in order to pursue his Fourth Amendment rights.

### C. Hernandez's appeal - No. 11-1404

Hernandez asserts two issues in his direct appeal. First, Hernandez contends that the district court violated his Sixth Amendment right to confrontation by refusing to allow him to cross-examine a witness, Ivan Ocon, called by another defendant after the government had elicited damaging testimony from Ocon about Hernandez. Second, Hernandez argues that the district court erred in instructing the jury that Hernandez and his codefendants could be found guilty of murder in the second degree under a theory of coconspirator liability.

*1) Denial of right to confrontation*

      *a) Background*

Prior to trial, the defendants agreed to proceed with a joint defense witness list. The district court in turn, with defendants' agreement, established a procedure whereby each defendant was permitted to conduct a direct examination of any defense witness called. If a defense witness provided testimony hostile to a particular defendant during another co-defendant's direct examination, the district court agreed to allow cross-examination by the affected defendant. The district court also allowed the government, during its cross-examination of each defense witness, to interpose questions regarding any of the defendants, regardless of which defendant called the defense witness.

During the defense portion of the trial, defendant Rosalez sought to introduce the testimony of Ivan Ocon, a federal inmate and Sureños member who was also housed at FCI-Florence at the time of Zuniga's murder. Hernandez's counsel objected to the introduction of Ocon's testimony, prompting the following discussion between Hernandez's counsel, one of the prosecutors, and the district court:

> [Hernandez's counsel]: I just wanted the Court to note that I object to the calling of Mr. Ocon. I would not have called him. I do believe that [Rosalez's counsel] is going to limit his questioning to narrow issues as it relates to Mr. Ocon. I am mostly concerned as it relates to any sort of cross-examination by the United States in their cross-examination based upon because Mr. Ocon does notify people that he was aware of an argument between my client [Hernandez] and [Zuniga] and does discuss that, discuss that with [Rosalez's] investigator. I believe those reports were turned over to the Government. Your Honor, I do believe as I said, [Rosalez's counsel] is going to do what he can to limit it. But I will not be asking any questions, and I will then be objecting to any sort of cross-examination as it relates to this particular issue or as it relates to my client.

I don't – again, I would not be calling him.

[Prosecutor]: Well, Your Honor, first of all, I point out that there was a joint defense witness list, and every one of these witnesses were listed on that joint list, so now to come in and argue, he's not my witness, he's someone else's, kind of takes the Government by surprise.

I certainly don't know what [Rosalez's counsel] is going to ask, but this witness [Ocon] was a Sureños, he was familiar with the politics of the Sureños, as we just talked about, he observed certain things relating to this incident. And to say that we just want to limit him for one purpose, I guess we'll have to see what the direct examination is, but we believe to impeach the individual, not simply [sic] you can't pull a statement out of context or pull an act out of context without being able to impeach that individual taking the witness stand.

THE COURT: That's correct. The objection is overruled.

Trial Tr. at 3186-3187.

Prior to Ocon testifying, the district court instructed the jury as follows:

Ladies and gentlemen, this witness is being called by [Rosalez's counsel], not called by the other defense counsel in the case. This is a conspiracy case, and we will give you separate verdicts on each of these defendants, but they will be able to cross-examine, if they wish, a witness called by another defendant, and then of course the Government has a right to cross-examine as well.

Id. at 3189.

During Ocon's direct examination by Rosalez's counsel, Ocon testified about his background, how and when he arrived at FCI-Florence, and his familiarity with the defendants, particularly Rosalez, and the victim Zuniga, with whom he had shared a cell for a three-month period. Ocon testified, in particular, that Rosalez, though a member of the Sureños gang, did not have a leadership role in the Pueblo Bravo housing unit. Ocon also testified about what he observed in the Pueblo Bravo housing unit and elsewhere in

37

FCI-Florence on the evening before and the morning of Zuniga's murder. In particular, Ocon testified that he and Rosalez ate breakfast together in the cafeteria that morning, and then proceeded directly to the gym to work out.

At the conclusion of Ocon's direct examination by Rosalez's counsel, the district court asked the other defense counsel if they had "any questions" for Ocon. Id. at 3221. Hernandez's counsel specifically responded, "No, Your Honor." Id. The prosecutor then proceeded to cross-examine Ocon. During this cross-examination, Ocon denied that Hernandez was the leader of the Sureños gang at FCI-Florence. But Ocon conceded that Zuniga desired to be the Sureños leader for the Pueblo Bravo housing unit, that in December 2008 there were problems between Zuniga and Hernandez, and that Zuniga was trying to persuade the other Sureños members to go against Hernandez. Ocon also conceded that, approximately a week or two prior to Zuniga's death, he observed Zuniga and Hernandez having a discussion in the prison yard. Ocon denied, however, that this discussion was heated or amounted to a confrontation. Lastly, Ocon denied making several statements to an investigator that were more incriminating of Hernandez and contrary to his trial testimony.

At the conclusion of the prosecution's cross-examination of Ocon, Hernandez's counsel requested permission to question Ocon: "I'm going to request, based on Court's rulings, to be able to question this witness." Id. at 3251. The district court denied that request. The district court subsequently issued "COURTROOM MINUTES" for that day of trial, noting that the "Oral Request by Ms. Moses [Hernandez's counsel] to be allowed

38

to conduct redirect examination is DENIED." Dist. Ct. Docket. No. 849, at 3.

     *b) Analysis*

     Hernandez argues on appeal that the district court's denial of his request to examine Ocon was erroneous and violated his Sixth Amendment right to confrontation. "We review de novo Defendant's claim that his Sixth Amendment confrontation rights were violated by the district court's . . . restriction" on his examination of Ocon. United States v. Woodard, 699 F.3d 1188, 1193 (10th Cir. 2012).

     "The Sixth Amendment guarantees the right of a defendant to 'be confronted with the witnesses against him.'" Id. at 1194 (quoting U.S. Const. amend. VI). "One of the primary interests secured by the Sixth Amendment's confrontation clause is the right of cross-examination," which "is the 'principal means by which the believability of a witness and the truth of his testimony are tested.'" Id. (quoting Davis v. Alaska, 415 U.S. 308, 316 (1974)). "A violation of this constitutional right occurs when the defendant is prohibited from engaging in otherwise appropriate cross-examination that, as a result, precludes him from eliciting information from which jurors could draw vital inferences in his favor." Id. (internal quotation marks omitted).

     "Violations of the Confrontation Clause are subject to harmless error analysis, under which the beneficiary of a constitutional error must prove beyond a reasonable doubt [that] the error complained of did not contribute to the guilty verdict." United States v. Chavez, 481 F.3d 1274, 1277 (10th Cir. 2007) (internal quotation marks and citation omitted; brackets in original). "In assessing harmless error, [this court] look[s] to

39

the context in which the statement was admitted, how it was used at trial, and how it compares to the properly admitted evidence." Id. (internal quotation marks omitted). "Several factors are helpful in determining whether a Confrontation Clause violation amounts to harmless error, among them (1) the importance of the witness's testimony in the prosecution's case, (2) the cumulative nature of the testimony, (3) the presence or absence of corroborating or contradictory testimony, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case." Id.

It is understandable, from a procedural standpoint, why the district court in this case chose to prohibit Hernandez from questioning Ocon. As noted, the parties and the district court had, prior to trial, agreed upon a procedure for the questioning of defense witnesses, and Hernandez's counsel expressly chose not to conduct a direct examination of Ocon after Rosalez's counsel first presented and questioned Ocon. Consequently, the district court apparently concluded that it would not allow Hernandez's counsel to question Ocon at the conclusion of the government's cross-examination because Hernandez had not conducted any direct examination.

But it is apparent from the record on appeal that Ocon, during the government's cross-examination of him, provided a limited amount of testimony that lent support to the government's case against Hernandez.[7] Consequently, Ocon effectively provided

---

[7] To be sure, Ocon's testimony would have been more damaging had he conceded the truth of prior statements he allegedly made to an investigator. But, unlike the situation in Nelson v. O'Neil, 402 U.S. 622, 624, 629-30 (1971), Ocon did not deny entirely the statements he made to the investigator. Consequently, this case is

(continued...)

40

testimony against Hernandez, thereby implicating Hernandez's Sixth Amendment rights of confrontation. Thus, the district court should have allowed Hernandez to question Ocon following the government's cross-examination, and its refusal to do so violated Hernandez's Sixth Amendment rights.

The question then becomes whether this constitutional violation was harmless beyond a reasonable doubt. Our review of the relevant factors leads us to conclude that it was, indeed, harmless. To begin with, it is clear from the record that Ocon, as a defense witness, was not key to the government's case against Hernandez or any of the other defendants. Further, Ocon's testimony was in large part cumulative of the testimony provided by the government's witnesses. The only unique testimony provided by Ocon were his statements that Zuniga desired to be the Sureños leader for the Pueblo Bravo housing unit, and that Zuniga had approached Ocon shortly before the murder and asked Ocon to side with Zuniga rather than Hernandez. But this testimony was by no means critical to the government's case against any of the defendants, including Hernandez. Relatedly, numerous government witnesses corroborated Ocon's testimony that there was a conflict between Zuniga and Hernandez, and that Zuniga and Hernandez had some type of heated discussion in the prison yard approximately a week or two prior to Zuniga's

---

[7](...continued)
distinguishable from Nelson. In Nelson, the Supreme Court held "that where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the defendant, and proceeds to testify favorably to the defendant concerning the underlying facts, the defendant has been denied no rights protected by the Sixth . . . Amendment[]." Id. at 629-30.

murder. Lastly, and again relatedly, the government's evidence overwhelmingly established that Hernandez was the leader of the Sureños gang, that a conflict had occurred between Hernandez and Zuniga, that Hernandez felt disrespected by Zuniga, and that Hernandez, consequently, had ordered Zuniga to be severely beaten so that he would be forced to leave FCI-Florence. In light of this overwhelming evidence, the district court's refusal to allow Hernandez to question Ocon was harmless beyond a reasonable doubt.

### 2) Instructions on coconspirator liability for second-degree murder

In his second issue on appeal, Hernandez argues that the district court, by instructing the jury that Hernandez could be found guilty of murder in the second degree on the basis of coconspirator liability under Pinkerton, violated his right to due process. In support, Hernandez argues that Count 2 of the superseding indictment mentioned only the possibility of an aiding-and-abetting theory of liability. In addition, Hernandez argues that murder in the second degree was not a foreseeable consequence of the conspiracy.

These arguments are identical to those asserted in part by Rosalez, and we reject them for the reasons discussed above in our response to the same issue raised by Rosalez.

The judgment in each appeal is AFFIRMED.