Michael E. Romero, Chief Judge
THIS MATTER comes before the Court upon the Motion to Dismiss or Abstain[1] filed by Secured Creditor Corey Inniss ("Inniss "); the Objection to the Motion to Dismiss[2] filed by Debtors Way to Grow, Inc., Pure Agrobusiness, Inc. and Green Door Agro, Inc. ("Debtors "); Inniss's Reply in support of the Motion to Dismiss;[3] and the Debtors' Response to the Reply.[4] The Court held a four day evidentiary hearing on the Motion to Dismiss on October 15-16, 2018, and November 8-9, 2018.
BACKGROUND
As of the Petition Date, Way to Grow, Inc. ("Way to Grow ") and Green Door Agro, Inc. ("Green Door ") owned and operated seven retail outlets in Colorado and an internet sales presence. Green Door has a sales facility in California. Way to Grow and Green Door are both subsidiaries of Pure Agrobusiness, Inc. ("Pure Agro "). Pure Agro also owns 100% of a non-debtor affiliate, Crop Supply, Inc., which caters to the Debtors' commercial clients, but is funded by Debtors.[5] Richard Byrd ("Byrd ") is the owner and principal manager of the Debtors.
Debtors' business involves the sale of equipment for indoor hydroponic and gardening-related supplies. As to their customers'
*115 uses of their products, Debtors have represented "[w]hile the hydroponic gardening equipment may and is used for many types of crops, the Debtors' future business expansion plan is tied to the growing cannabis industry which is heavily reliant on hydroponic gardening."[6]
Byrd acquired ownership and control of the Debtors through a sale transaction with Inniss, who founded Way to Grow in Colorado in 2002. During Inniss's ownership, Way to Grow grew from a single store in Fort Collins to a chain of seven retail stores throughout Colorado's Front Range. Several of the Debtors' seven storefronts were in locations leased to the Debtors by Susan Inniss, the mother of Corey Inniss. James Blaha ("Blaha "), Susan Inniss's former husband, also leased a location to the Debtors through his wholly-owned entity, Blue Moose, LLC ("Blue Moose ").
The events leading to this bankruptcy case began on January 1, 2016, when Byrd and Inniss entered into an agreement for the sale of Way to Grow ("Purchase Agreement ").[7] As set forth in Section 2.2 of the Purchase Agreement, the consideration for the sale consisted of: 1) a cash payment to Inniss of $ 2,500,000; 2) a secured promissory note to Inniss ("Note ") for the principal amount of $ 22,500,000; and 3) 12,500,00 shares of Byrd's common stock in Pure Agro, Debtors' holding company, with a par value of $0.001.[8] According to Debtors' Amended Schedules and Statement of Financial Affairs, Inniss owns approximately 21.26% of the stock in Pure Agro.[9] Pursuant to Section 3 of the Note, Debtors' pledged collateral securing its obligations to Inniss consists of "any and all property and assets" of the Debtors, including after-acquired property, accounts receivable and inventory.[10]
A short time after the sale closed, on April 6, 2018, Inniss, individually and derivatively on behalf of Pure Agro as a shareholder, filed a complaint against the Debtors and Byrd in the District Court for Larimer County, Colorado.[11] On April 9, 2018, Inniss moved to appoint a receiver over Pure Agro and its subsidiaries in the State Case, seeking to oust Byrd as the Debtors' manager. Debtors filed bankruptcy before a receiver was appointed.
Because Debtors filed this bankruptcy in the face of a receivership, Inniss argues this case is no more than a continuation of the two-party dispute between Inniss and Debtors arising from the pending receivership proceedings. Inniss asserts this Court should dismiss or abstain from these bankruptcy proceedings in favor of allowing the State Case to proceed through conclusion.
From the beginning of this case, Debtors represented an intent to reorganize by rejecting over-market leases and otherwise reducing expenses. Through August 2018, Debtors' Monthly Operating Reports disclosed cumulative net cash flow of $ 109,320 on revenues of $ 2,027,246 and expenses of $ 1,917,928.[12] Meanwhile, Debtors' profit and loss statements reveal a total net operating loss of $ 607,865 through August 2018.[13]
Inniss argues these net operating losses, together with other financial performance issues, constitute violations of this Court's orders on the Debtors' use of Inniss's cash collateral. In response, Debtors maintain *116 their gradual progress towards reorganization, including rejecting over-market leases, will result in significant savings not yet reflected in its financial disclosures. It is true during the case, Debtors rejected four leases for its Colorado retail locations in Lakewood, Colorado Springs, Pueblo, and Fort Collins, and closed its location in Silverthorne.[14] A motion to reject one of Debtors' Denver leases remains pending.[15] One of Debtors' store managers also testified Debtors reduced their workforce as part of its cost-saving measures.
These first two issues - Debtors' alleged violations of the cash collateral order and the purported two-party nature of the dispute - are essentially secondary issues to the main event, namely, the Debtors' connections to the marijuana industry. As discussed extensively below, bankruptcy courts nationwide have wrestled with the issue whether companies connected to marijuana businesses legal under state law are eligible for bankruptcy protection, where those connections constitute continuing violations of federal law.
ANALYSIS
A. LEGAL FRAMEWORK FOR MARIJUANA RELATED BANKRUPTCY CASES
Pursuant to the Controlled Substances Act of 1970 ("CSA "),[16] marijuana[17] is designated a Schedule I controlled substance under federal law.[18] Therefore, under the CSA, it is a federal crime to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]"[19] Further, the CSA prohibits any person from possessing or distributing "any equipment ... product or material which may be used to manufacture a controlled substance ... knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance" in violation of federal law.[20] The CSA also expressly provides any person who "conspires to commit any offense" under the CSA shall be subject to the same penalties as the principal.[21]
Notwithstanding the absolute federal prohibition on the use, sale or cultivation of marijuana, several states, including Colorado, have legalized marijuana for both medical and recreational use.[22] In Gonzales v. Raich , the U.S. Supreme Court definitively held the federal government's designation of marijuana as a controlled substance supersedes contrary state law through application of the commerce *117 clause.[23] As a result, there remains an ever-shifting landscape of federal enforcement of marijuana criminalization where the same activity is fully legal under state law.[24]
Of course, bankruptcy laws and bankruptcy courts are purely creatures of federal law. Accordingly, bankruptcy courts have consistently dismissed cases where debtors engaged in ongoing CSA violations, or where a debtor's reorganization efforts depend on funds which can be considered proceeds of CSA violations.
The seminal case on the issue from this District is Judge Howard Tallman's (Ret.) decision in In re Rent-Rite Super Kegs West Ltd.[25] There, the court considered a motion to dismiss a Chapter 11 case in which the debtor derived 25% of its revenue from leasing warehouse space to marijuana businesses.[26] Finding this activity plainly prohibited under § 856(a), the court concluded the debtor was in continuing violation of federal law during its bankruptcy case.[27] Analyzing Colorado's legal framework for marijuana legalization, Judge Tallman noted Colorado law "make[s] it clear that their provisions apply to state law only. Absent from either enactment is any effort to impede the enforcement of federal law."[28] Accordingly, the court concluded:
[E]ven if the Debtor is never charged or prosecuted under the CSA, it is conducting operations in the normal course of its business that violate federal criminal law. Unless and until Congress changes that law ... a federal court cannot be asked to enforce the protections of the Bankruptcy Code in aid of a Debtor whose activities constitute a continuing federal crime.[29]
As additional grounds for dismissal, Judge Tallman further concluded the debtor was barred from bankruptcy relief by the clean hands doctrine:
The Debtor freely admits that it leases space to those who are engaged in the cultivation of marijuana. Even if the Debtor's [sic ] holds a good faith - albeit misguided - belief that Colorado state law would prevail over the federal law or that the federal law is unlikely to be enforced, that is quite beside the point. The Debtor has knowingly and intentionally engaged in conduct that constitutes a violation of federal criminal law and it has done so with respect to its sole income producing asset."[30]
Based on these conclusions, the Rent-Rite court found it necessary to dismiss the bankruptcy case pursuant to 11 U.S.C. § 1112(b).[31]
Two years later, in In re Arenas , Judge Tallman expanded the holding of Rent-Rite to dismiss a bankruptcy case where the bankruptcy trustee would be required to administer marijuana-related assets.[32]
*118 In Arenas , the debtors, who operated a marijuana grow facility, filed for relief under Chapter 7 of the Bankruptcy Code. A Chapter 7 trustee was appointed in the ordinary course.[33] The Office of the United States Trustee ("UST ") moved to dismiss. Assessing the ability of a Chapter 7 trustee to administer marijuana assets, Judge Tallman reasoned:
Here, the Debtors' chapter 7 trustee cannot take control of the Debtors' Property without himself violating § 856(a)(2) of the CSA. Nor can he liquidate the inventory of marijuana plants Mr. Arenas possessed on the petition date because that would involve him in the distribution of a Schedule I controlled substance in violation of § 841(a) of the CSA. The Court finds that administration of this case under chapter 7 is impossible without inextricably involving the Court and the Trustee in the Debtors' ongoing criminal violation of the CSA.... To allow the Debtors to remain in a chapter 7 bankruptcy case under circumstances where their Trustee is unable to administer valuable assets for the benefit of creditors would allow them to receive discharges without turning over their non-exempt assets to the Trustee. That would give the Debtors all of the benefits of a chapter 7 bankruptcy discharge while allowing them to avoid the attendant burdens. The impossibility of lawfully administering the Debtors' bankruptcy estate under chapter 7 constitutes cause for dismissal of the Debtors' case under 11 U.S.C. § 707(a).[34]
The Arenas debtors further sought to avoid dismissal by seeking to convert their case from Chapter 7 to Chapter 13. Denying that request, the court concluded the debtors' plan payments would necessarily be funded by proceeds of a criminal enterprise under federal law, and therefore conversion was not in good faith.[35] The court reasoned a plan could not be administered by a Chapter 13 trustee who would be prohibited from receiving or distributing funds derived from CSA violations.[36]
On appeal, the Bankruptcy Appellate Panel for the Tenth Circuit ("BAP ") affirmed Judge Tallman's opinion dismissing the Arenas' bankruptcy case.[37] The question presented to the BAP was whether "a debtor in the marijuana business [can] obtain relief in the federal bankruptcy court?"[38] The BAP answered this question with a resounding "No."
The BAP agreed with Judge Tallman "that while the debtors have not engaged in intrinsically evil conduct, the debtors cannot obtain bankruptcy relief because their marijuana business activities are federal crimes."[39] Applying the eleven factors to determine good faith set forth by the U.S. Court of Appeals for the Tenth Circuit in Flygare v. Boulden ,[40] the BAP
*119 agreed the debtors could not show an employment history to support future income unrelated to marijuana, the trustee could not legally administer and distribute marijuana derived assets, and, while their motives were not improper, the debtors were not acting in good faith according to an objective standard.[41] That is, the inability to propose a confirmable plan made it "objectively unreasonable" for the debtors to seek Chapter 13 relief.[42]
Finally, the BAP addressed the Arenas' argument the case should not be per se dismissed or converted, but rather, the trustee should simply abandon the marijuana assets:
It is not clear that a bankruptcy court may order a trustee to abandon assets sua sponte . And even if the court can do that, this bankruptcy estate, shorn of its marijuana assets, would likely yield no dividend to the creditors. The debtors would get a discharge and get to keep (via abandonment) their marijuana assets while being protected from collection activities. This also strikes us as prejudicial delay that amounts to cause for dismissal.[43]
This Court addressed a marijuana-related issue only once, in B Fischer Industries, LLC .[44] There, debtor manufactured allegedly knowingly sold butane for use in manufacturing marijuana concentrates.[45] The Court dismissed the bankruptcy case on March 8, 2017, on the debtor's motion. However, a creditor pursued a motion for sanctions relating to the bankruptcy filing and the Court retained jurisdiction for purposes of adjudicating the creditor's motion.[46] A discovery dispute arose requiring the Court to analyze the applicability of the crime-fraud exception to the attorney-client privilege where the alleged crime involves a marijuana-related offense.[47] Relevant to the issues in this case, the Court in B. Fischer found debtor's pre-petition sale of butane "may " have violated the CSA, but regardless, the inquiry should not focus strictly on pre-petition activities.[48] Rather, the focus should be on the time wherein debtor sought bankruptcy relief and thereafter.[49]
On a post-petition basis, the Court concluded it could not find the debtor's sales of butane to a pass-through non-debtor affiliate necessarily violated the CSA.[50] Of course, this was the correct inquiry as pertaining to a potential exception to the attorney-client privilege, but, nonetheless, the Court agreed "a debtor's pre-petition involvement in the marijuana industry is not a per se bar to relief under *120 the Bankruptcy Code."[51] Finding the creditor failed to meet her burden of establishing the debtor's violation of the CSA, the Court denied her crime-fraud motion.[52]
Taken together, the decisions in Rent-Rite, Arenas and B. Fischer elucidate three basic propositions. First, a party cannot seek equitable bankruptcy relief from a federal court while in continuing violation of federal law. Second, a bankruptcy case cannot proceed where the court, the trustee or the debtor-in-possession will necessarily be required to possess and administer assets which are either illegal under the CSA or constitute proceeds of activity criminalized by the CSA. And third, the focus of this inquiry should be on debtor's marijuana-related activities during the bankruptcy case, not necessarily before the bankruptcy case is filed.
Certainly, many other bankruptcy courts in marijuana-legalization states have addressed similar issues and, for the most part, have reached similar conclusions.
In In re McGinnis ,[53] debtor proposed Chapter 13 plan to be funded by: 1) a business leasing a warehouse to a marijuana grower; 2) the debtor's own marijuana grow operation; and 3) rental income from property housing tattoo artists.[54] Because the plan was to be funded through operations dependent "on a product the cultivation and sale of which violates federal law[,]" the court held the plan was proposed by means forbidden by law and could not be confirmed pursuant to 11 U.S.C. § 1325(a)(3).[55] Further, due to the federal illegality of the operations, the court found "the predicted income stream from the marijuana operations is [not] reasonably certain to produce sufficient income to fund the Plan[,]" and therefore concluded the plan failed the feasibility requirement of 11 U.S.C. § 1325(a)(6).[56]
In Northbay Wellness Group v. Beyries (In re Beyries) , plaintiff sold medical marijuana.[57] Debtor was their attorney.[58] Plaintiff sought a non-dischargeability judgment based on the attorney's knowing misrepresentations concerning plaintiff's sales tax obligations.[59] While the court held the debt met the elements of 11 U.S.C. § 523(a)(4), the court ruled it could not enter a judgment for plaintiff because they engaged in unlawful activity.[60] Even though the activity was legal under state law, in a federal court the parties were "conspiring to sell contraband."[61] The court found the plaintiff in pari delicto and dismissed the adversary.[62]
On appeal, the U.S. Court of Appeals for the Ninth Circuit reversed and remanded the bankruptcy court's order dismissing the adversary.[63] The Ninth Circuit determined the parties' engagement in a marijuana business did not automatically *121 require application of in pari delicto .[64] Instead, in pari delicto requires a balancing test of the parties' respective wrongdoing.[65] Had the bankruptcy court properly conducted the required balancing test, the Ninth Circuit would have concluded the debtor's wrongdoing outweighed the plaintiff's. Debtor misappropriated client trust funds, and could not escape liability for that theft through a bankruptcy discharge simply because the creditor-plaintiff's business is marijuana.[66]
In re Medpoint Management LLC[67] involved an involuntary Chapter 7 petition filed against a medical marijuana business. The debtor's assets consisted entirely of marijuana products and related intellectual property.[68] The petitioning creditors' claims arose from credit extended or services knowingly provided in furtherance of debtor's marijuana business. Upon debtor's opposition to an order for relief, the court dismissed the involuntary bankruptcy case.[69] The court reasoned the possibility of forfeiture of the debtor's marijuana assets pursuant to CSA imposed an unacceptable risk to a Chapter 7 estate and trustee.[70] Further, the court held it could not issue an order for relief which would effectively order a Chapter 7 trustee to possess and administer assets in violation of federal law.[71] The court also found the petitioning creditors were not eligible to file the involuntary petition because of in pari delicto . The creditors knew the debtor was in the marijuana business, voluntary chose to engage in that business with them, and therefore had unclean hands precluding them from petitioning a federal court for relief.[72] Finally, the court declined to sanction the creditors, finding no bad faith in filing the involuntary petition, because the marijuana business presented a novel issue, and the debtor appeared insolvent and properly in bankruptcy but for the marijuana issue.[73]
In In re Johnson ,[74] a Chapter 13 debtor was a licensed "caregiver" and marijuana grower operating legally under Michigan law. The UST filed a motion to dismiss. Debtor's income was $ 1,203 per month from social security and $ 1,000 per month from his marijuana business.[75] First, the court noted all federal judges take an oath to uphold federal law, and allowing a marijuana case to proceed in federal court violates this oath.[76] No matter what precautions were taken, allowing the case to remain in bankruptcy would result in both trustee and the court supporting the debtor's criminal enterprise.[77] Second, the court looked to 28 U.S.C. § 959(b), which prohibits federal officers from holding contraband or proceeds or instrumentalities of federal criminal activity.[78] The court held this prohibition applies *122 to trustees in bankruptcy cases.[79] Third, the debtor's intent to continue his marijuana business post-petition constituted being "engaged in business" for purposes of 11 U.S.C. § 1304, requiring court approval for expenditure of funds pursuant to 11 U.S.C. § 363(c).[80] The court could not approve any expenditures related to a marijuana business.[81] Nonetheless, the court declined to dismiss the case and gave the debtor a shot at a discharge, but enjoined him from conducting his marijuana business or using any property of the estate in furtherance of illegal activity.[82] The court further ordered the trustee to abandon all marijuana plants within the estate and ordered the debtor to destroy all his marijuana plants and byproducts as a condition remaining in bankruptcy.[83]
In In re ARM Ventures, LLC ,[84] debtor proposed a plan which would be funded through income generated by the sale of marijuana products. The court held a plan cannot be confirmed unless the business generating the income is legal under both state law and federal law.[85] That is, a reorganization plan dependent on marijuana income can per se be proposed in bad faith.[86] Indeed, debtor's tenant was not licensed by the state of Florida to grow marijuana, and was very unlikely to get a federal license.[87] Therefore, the court concluded debtor's plan was not feasible and the bankruptcy case was ripe for dismissal.[88] However, given the significant non-insider unsecured debt, the court declined to dismiss.[89] Instead, based on the debtor's bad faith arising from his illegal activities, the court granted stay relief to the debtor's major secured creditor.[90] However, the court stayed any foreclosure sale for 14 days to provide debtor an opportunity to file a plan that would not depend on the sale of marijuana as a source of income.[91]
In NW, SPNWY, LLC v. Cook Investments NW ,[92] debtor leased commercial property to a marijuana grower. As part of its plan, debtor proposed to reject the marijuana grower's lease. Because debtor's plan did not depend on future income derived from illegal activity, the court concluded the debtor's plan was confirmable.[93] On appeal and upon an objector's motion for stay pending appeal, the U.S. District Court for the Western District of Washington began with the simple observation "[b]ankruptcy courts are neither regulatory nor criminal courts."[94] The court continued "[a] rudimentary search of relevant authorities reveals that numerous courts have confirmed plans regardless of whether actual provisions of the plans result in the violation of federal or state laws."[95] Because the plan itself would not violate *123 federal law, but instead would be funded through proceeds of purely legal activity (because debtor rejected the marijuana lease), the district court denied the motion for stay pending appeal.[96]
Finally, in Olson v. Van Meter ,[97] the debtor filed Chapter 13 to prevent foreclosure on commercial property leased to the operator of a marijuana dispensary.[98] Debtor's plan called for sale of this real property to pay off creditors, and as a result required rejection of the lease with the marijuana dispensary.[99] Nonetheless, the court dismissed the case sua sponte on grounds the debtor's post-petition acceptance of rents from the dispensary business was ongoing criminal violation precluding federal bankruptcy relief.[100]
The Bankruptcy Appellate Panel for the Ninth Circuit reversed and remanded.[101] First, the appellate panel held the bankruptcy court did not sufficiently articulate the legal basis for its ruling or make findings to support its conclusion the debtor was violating federal law.[102] The appellate panel held the court could not summarily dismiss the bankruptcy case, but rather was required to take evidence and make findings on issues of bad faith and unclean hands, as well as whether the debtor was actually committing a controlled substances act violation.[103] The appellate panel reasoned "[a]lthough debtors connected to marijuana distribution cannot expect to violate federal law in their bankruptcy case, the presence of marijuana near the case should not cause mandatory dismissal."[104]
B. DEBTORS' POTENTIAL VIOLATIONS OF THE CSA
1. Complicity - Aiding and Abetting and Conspiracy
Based on these authorities, this Court's first inquiry must be whether the Debtors are engaged in ongoing violations of federal law. If the analysis is answered in the affirmative, Debtors' bankruptcy cases may not proceed and would be ripe for dismissal.
There is no evidence before the Court that the Debtors directly "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]"[105] Therefore, if the Debtors are violating § 841(a)(1), they are doing so indirectly, through one or more theories of legal complicity.
The first such allegation of Debtors' indirect criminal activity is Inniss's assertion Debtors' sale of hydroponic equipment to marijuana grow operations constitutes aiding and abetting CSA violations by its customers. Under federal law, aiding and abetting criminal activity is itself criminalized pursuant to 18 U.S.C. § 2, which provides "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." This is not to say aiding and abetting is an independent crime. Rather, 18 U.S.C. § 2"simply abolishes the common-law distinction *124 between principal and accessory."[106]
" '[U]nder § 2, those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime.' "[107] "[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission," i.e., "with full knowledge of the circumstances constituting the charged offense."[108] "Mere presence at a crime scene or knowledge alone that a crime is being committed is insufficient."[109] "[A] defendant must share in the intent to commit the underlying offense."[110]
Concomitant with his assertion the Debtors are aiding and abetting CSA violations, Inniss invokes conspiracy as an alternate theory of complicit liability pursuant to § 846. In the Tenth Circuit, to obtain a conviction for conspiracy in violation of § 846, the government must establish beyond a reasonable doubt: 1) there was an agreement to violate the law; 2) the defendant knew the essential objectives of the conspiracy; 3) the defendant knowingly and voluntarily took part in the conspiracy; and 4) the co-conspirators were interdependent.[111] "[T]he evidence that supports a conviction for conspiracy can also be used to support a conviction for aiding and abetting in the possession of illegal narcotics with intent to distribute."[112] The main difference between conspiracy and aiding and abetting is unlike co-conspirator liability, in that "liability as an aider and abetter is not contingent upon a prior 'agreement or conspiracy to perform' a criminal act."[113]
"A conviction for aiding and abetting can rest on a wide range of underlying conduct, including 'acts, words or gestures encouraging the commission of the offense,' either before or at the time of the offense."[114] "Some mental state beyond 'mere assent' or 'acquiescence' is also required."[115] "Even mere 'words or gestures of encouragement' constitute affirmative acts capable of rendering one liable *125 under this theory."[116] Because of this, the Tenth Circuit has held "a defendant may not stumble into aiding and abetting liability by inadvertently helping another in a criminal scheme unknown to the defendant."[117]
Of course, there are limitations to both theories of complicit liability. Importantly, Byrd testified Debtors are not "in" the marijuana industry but are instead "riding the wave." Debtors' position is they are not participating in violations of the CSA, but rather, merely providing general information to their customers which is useful and applicable to growing almost any type of crop, not just marijuana. There is case law supporting Debtors' theory providing information to customers does not violate the CSA.
In Mann v. Gulickson ,[118] a dispute arose over a contract for hydroponic and licensing consulting to the marijuana industry. The business was to "provide consulting and information services to persons desiring to engage in hydroponic farming" and to "provide consulting and documentation preparation services to persons or entities desiring to establish medical cannabis dispensaries and related businesses in states where such activities were legal."[119] At no time did these companies possess, cultivate or distribute cannabis plants.[120] Instead, its income was derived solely from the sale of consulting services and information packs and document preparation.[121]
The question before the court in Gulickson was whether a contract for these services was enforceable notwithstanding the CSA.[122] The court held the contract could be enforced because of California's liberal policy of the "legality" element of contracts.[123] In a footnote the court observed:
[The] object of the contract here is not necessarily illegal. The parties agreed Gullickson would pay Mann to purchase the Companies.... There is no evidence in the record that the Companies actually possess, use, cultivate, or distribute marijuana-medical or otherwise.
Moreover, while Gullickson argues the businesses "conspire" to do so, this so-called conspiracy appears to be based entirely on providing information to customers. In Conant v. Walters , the Ninth Circuit affirmed an injunction prohibiting federal officials from revoking a physician's registration, or even investigating a physician's conduct, based on the physician's recommendation that a patient use marijuana.[124]
In Green Earth Wellness Center, LLC v. Atain Specialty Insurance Co. ,[125] the U.S. District Court for the District of Colorado addressed another breach of contract claim against this backdrop. Green Earth operated a medical marijuana business, for which Atain provided commercial liability insurance.[126] Green Earth made two claims *126 under its policy, both of which Atain denied.[127] The first claim was for damage to Green Earth's marijuana plants because of a wildfire; the second was for the theft of some of its marijuana plants.[128]
Green Earth sued Atain for breach of contract, among other things.[129] Atain moved for summary judgment, arguing public policy based on the federal prohibition on marijuana required denying coverage for Green Earth's losses.[130] The court noted that "the nominal federal prohibition against possession of marijuana conceals a nuanced (and perhaps even erratic) expression of federal policy."[131] The Green Earth court explained that because of "a continued erosion of any clear and consistent federal public policy in this area.... the Court declines Atain's indirect invitation to declare the Policy void on public policy grounds."[132] The court found that "Atain, having entered into the Policy of its own will, knowingly and intelligently, is obligated to comply with its terms or pay damages for having breached it."[133] The court consequently denied Atain's summary judgment motion.
Pursuant to these authorities, to determine whether Debtors are complicit through aiding and abetting their customers' violations or conspiring with them to do so, the Court must decide whether Debtors' conduct rises above the level of merely providing information to customers, and instead, evidences a specific intent for the Debtors to assist their customers in violating § 841(a)(1). Additionally, to find conspiracy liability under § 846 the Court must further find an agreement between Debtors' and their customers to violate the law.
The Court concludes the Debtors are violating neither § 846 nor 18 U.S.C. § 2. As to conspiracy liability, there is insufficient evidence before the Court concerning an actual agreement between Debtors and their customers to violate the CSA. While, as discussed in further detail below, the Debtors may be aware at least some of their customers will use equipment purchased from the Debtors to manufacture a controlled substance (and this may give rise to a separate violation of the CSA), the Debtors' sales are never contingent or directly affected by the crop being grown. As in Gullickson , the contracts between Debtors and their customers, if any, do not specifically contemplate, depend upon, or require any activity that is necessarily illegal.
Likewise, the Court concludes the Debtors' business activities do not evidence a specific intent to violate the CSA. Under Rosalez , which this Court is bound to follow, aiding and abetting liability requires more than "knowledge alone that 'a crime is being committed[.]' "[134] Instead, the Court would need to conclude Debtors share the same intent as their customers to violate the CSA and willfully associate themselves with their customers' criminal ventures.[135] The Debtors' mens rea does not meet this exacting standard.
The Debtors' business is not limited in scope to marijuana sales. The evidence certainly shows many of the Debtors' customers *127 are in the marijuana industry. As discussed below, this fact is no secret to the Debtors. However, by its nature and as shown by the evidence, the Debtors' business serves a broad customer base consisting of both commercial and individual horticulturalists, growing a variety of legal crops. Debtors' intent is to sell its product to any clientele engaged in hydroponic horticulture, and Debtors' products are generally applicable to those activities regardless the specific crop grown. Without sharing its marijuana-connected customers' specific intent to cultivate and distribute marijuana, Debtors are not aiding and abetting violations of the CSA.
2. Sale of Drug Manufacturing Equipment
While the Debtors are not violating the CSA through complicity in their marijuana growing customers' crimes, another provision of the CSA produces violations based upon a lesser mens rea of simply knowing how Debtors' products will be used. Specifically, § 843(a)(7) makes it a federal crime to "manufacture" or "distribute" any "equipment, chemical, product or material which may be used to manufacture a controlled substance ... knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance ...."[136]
In U.S. v. Truong ,[137] the Tenth Circuit analyzed the "reasonable cause to believe" element of § 843(a)(6), which makes it unlawful to possess any equipment, chemical or product which may be used to manufacture a controlled substance knowing, intending, or having reasonable cause, that it will be used to manufacture a controlled substance. Sections 843(a)(6) and (7) are nearly identical, with sub-section (a)(6) criminalizing possession of drug manufacturing equipment, and sub-section (a)(7) criminalizing manufacture, distribution or exportation of drug manufacturing equipment. While both seem applicable in this case because Debtors both possess and sell their hydroponic equipment, the Court will refer primarily to sub-section (a)(7) as it is the sale of equipment which concerns the Court. In any event, according to Truong and other cases cited below, the scienter requirement of each sub-section (and, separately, possession and distribution of chemical precursors charged under § 841(c)(2) ) are the same, so the distinction is practically without a difference.
In Truong , the defendant sold large quantities of pseudoephedrine, which can be used to manufacture methamphetamine.[138] Observing § 843(a)(6) contains "an unusually specific mens rea requirement[,]" the Court of Appeals held "[i]t is not sufficient for the government to prove that the defendant knew, intended, or had reasonable cause to believe that the substance would be abused or would be used illegally. Nor is it sufficient for the government to prove that the defendant was negligent or reckless with respect to the risk .... The government must prove the defendant was aware, or had reasonable cause to believe, that the substance would be used for the specific purpose" of manufacturing drugs.[139]
Thus, under the law of this Circuit the "reasonable cause to believe"
*128 standard employed by both §§ 843(a)(6) and (a)(7) is "akin to actual knowledge."[140] That is, the inquiry is "entirely subjective, the inquiry is not to be viewed from the perspective of a hypothetical reasonable person."[141] In Truong , to convict, the jury was required to infer the defendant "had actual knowledge, or something close to it, that the pseudoephedrine and ephedrine he sold would be used to manufacture methamphetamine."[142] "A defendant's own actions or words may ... reveal his knowledge that he is selling" material which will be used to manufacture a controlled substance.[143]
Ultimately, the Tenth Circuit held the government had not sufficiently proven actual knowledge the products sold would be used to manufacture drugs, reversing the defendant's conviction.[144] The only evidence the government presented to prove the defendant had actual knowledge pseudoephedrine could be used to manufacture methamphetamine was the defendant's statement he did not know how the pseudoephedrine he sold would be used.[145] There was no evidence the defendant had ever learned of any connection between pseudoephedrine and methamphetamine production, and no evidence any of defendant's statements indicated he knew the his pseudoephedrine would be used for such a purpose.[146] Even though there was evidence to permit the jury to infer defendant was "up to no good[,]" and even though the evidence showed a reasonable person would be on notice "something nefarious was going on[,]" the "unusually specific mens rea requirement of 21 U.S.C. §§ 841 and 843" requires more.
Notably, Truong is considered as reflecting the minority view of the mens rea required to violate § 843(a)(6) or (a)(7), and § 841(c)(2).[147] At least three other circuits have held these statutes allow conviction either upon subjective knowledge or an objective "cause to believe."[148] In U.S. v. Williamson , the Tenth Circuit Court of Appeals mildly distinguished Truong , without changing the court's interpretation of the "reasonable cause to believe" standard, by explaining Truong depended on the court's view "based on only the information known to the specific defendant, a reasonable person would not have had reason to believe that the pseudoephedrine *129 would be used to make methamphetamine."[149]
Even as the minority view, the Court is bound to follow Truong and apply its interpretation of the scienter requirement under § 843(a)(6) and 841(c)(2) to this Court's analysis under § 843(a)(7). In this case, however, the rules delineating the "reasonable cause to believe" standard may have little effect, because the Court finds the Debtors indeed have actual knowledge they are selling equipment which will be used to manufacture a controlled substance.
As the Court reads § 843(a)(7), the important distinction for purposes of criminality is not the specific product being sold, but whether the seller of such product knows how equipment will be used. There is little doubt hydroponic supplies are "equipment" related to marijuana cultivation. Indeed the Tenth Circuit has held evidence of the existence of a hydroponic grow operation supports a warrant for search and seizure on a charge of producing a controlled substance with intent to distribute.[150]
There is ample evidence in this case proving Debtors have "reasonable cause to believe" the equipment they sell to at least some of their customers will be used to manufacture marijuana. First, Inniss testified meeting the needs of cannabis growers is essential to Debtors' business, because those growers will simply buy their hydroponic equipment elsewhere if Debtors cannot meet their needs. Inniss also testified Debtors' business increased significantly and immediately upon the federal government issuing the Cole Memo.[151] Inniss testified negotiations for the sale of the business to Byrd were "very specific in terms of cannabis." Inniss referred to Byrd as "Mr. Marijuana Entrepreneur" and testified the "whole thesis" of the transaction was to combine Byrd's California marijuana-related operations with the Debtors' operations in Colorado. Inniss testified the Debtors have always chosen products based on their favorability of use in marijuana cultivation, including by customizing Debtors' pesticide inventory to provide products approved for use in marijuana cultivation by the Colorado Department of Agriculture. Debtors even sell some products that Inniss testified would be cost-prohibitive for use in cultivating any crop except marijuana, because marijuana is the highest yielding cash crop which can be grown. Even further, Inniss testified Debtors sell so-called "bubble bags" which are specifically used to make "water hash," a concentrated marijuana derivative.
The Court finds Inniss's testimony credible. Despite the acrimony in the parties' relationship, Inniss based his testimony on personal experience both as the founder and principal operator of the Debtors' business for many years before the sale to Byrd. Inniss's testimony confirms the Debtors' business model and operations have not materially changed since the sale to Byrd, and as a result Inniss's testimony regarding the business of what were once his companies is both credible and based upon first-hand, personal knowledge.
Many of Debtors' largest customers use aliases with Debtors rather the real name of their business.[152] While the Court can *130 simply infer the use of aliases knowingly disguises some nefarious activity, Inniss gave unrebutted testimony linking the aliases on Debtors' customer lists to specifically identified dispensaries and grow operations, all of which Inniss said he has disclosed to Byrd.
Debtors have participated, in some fashion, in the "Cannabis Cup" since at least 2016. The Cannabis Cup is a cannabis industry trade show and the world's biggest marijuana grow competition. Other "grow offs" attended by Debtors include the Indo Expo, The Grow Off, and Max Yields. At these and similar events, Debtors have given away promotional materials bearing the Way to Grow name in the form of lighters and rolling papers, which, together, are strongly associated with marijuana use.[153] Debtors have booths at the events and use them to build closer relationships to marijuana dispensaries and growers. Debtors have contributed prize money to be awarded to the winners of the grow-offs. Debtors do "cross-promotions" with dispensaries and advertise deals on a cannabis talk show.
Bradley Hale, who has been the store manager for the Debtors' Boulder location since May 2011, testified he, and all of his co-workers, were themselves marijuana growers who bought supplies from the Debtors before becoming employees. Most of Hale's interactions with customers have been about cannabis. Hale described Way to Grow stores as having a "Cheers Bar" atmosphere, where everyone knows your name and forming personal relationships is key to sales. Hale confirmed Debtors choose products based on favorability of use in marijuana cultivation. Hale also confirmed the "trim bags" and "bubble bags" sold by Debtors are specifically intended for use with cannabis. As recently as August 2018, Hale testified Debtors engaged in cross-promotions with dispensaries at local grow-offs. Hale testified as much as 95% of customers in his store are using Debtors' products to grow marijuana.[154]
Cody Ross, manager of Debtors' Fort Collins location for the past five years, and with experience in other of the Debtors' stores, testified "everybody just assumes" customers talking generally about help with plants are talking about marijuana plants. Ross testified Debtors have a reputation for being experts in "advising on cannabis growing and ... in selling products that are geared toward cannabis[.]" Ross has even visited cannabis growing facilities which are also Debtors' customers. A list of approved products for use in cannabis cultivation is made available in the store; Debtors do not have that for any other plants. Customers sometimes bring marijuana plants, or, more commonly, photographs of marijuana grow operations, to Debtors' stores, and Debtors' employees "typically" offer products to those customers based on those photographs. If there was any doubt remaining from his testimony, Ross expressly stated, "I know what a lot of them grow" and then, when asked if they grow cannabis, responded "Yes, sir" as to the "vast majority" of those customers.
Next, the Court reviewed press statements and so-called "investor decks" prepared by an investment banking firm on behalf of the Debtors. These show Byrd has commented to Bloomberg Markets, "[w]e are the picks and shovels play for what we're calling the Green Rush."[155] In a statement to Business Wire, Byrd stated, *131 "[w]ith the merger of Way to Grow completed in January 2016, Pure Agro is now the leading one-stop solution for indoor plant, product and cannabis growers in Colorado and California."[156] In March 2016, Byrd commented to the BusinessDen publication that Debtors' new location would "cater to commercial cannabis growers instead of private hobbyists growing at home."[157]
An investor deck prepared on behalf of the Debtors by an investment banking firm specifically refers to marijuana as "the catalyst for hydroponic R & D."[158] The investor decks said the company would "take advantage of the current growth of the marijuana industry" and will "leverage the marijuana industries profitability[.]"[159] A second investor deck gave statistics on marijuana legalization and growth trends.[160] Yet another, dated January 2018, identifies, by name (and logo), five marijuana dispensaries as Debtors' "Notable Customers."[161]
Finally, the Court reviewed a very-telling e-mail drafted by Joe Pyle, Debtors' VP of Operations, to all of Debtors' store managers.[162] In the e-mail, dated June 28, 2018, Pyle instructed the managers to "remove from sight" anything "MJ related in your stores" such as "tv screens with MJ related content, the 3 a light book, pictures, posters, anything."[163] Pyle further instructed the managers to "not discuss MJ directly with any customers and do not allow customers to bring anything plant related into your stores."[164] While, on the one hand, the e-mail evidences what may be post-petition remedial measures, it clearly demonstrates Debtors' prior use of marijuana related signage in their stores, as well as consciousness of the negative effects continued use of marijuana signage may have on Debtors' ability to remain in bankruptcy.
Considering this abundant evidence, Debtors' efforts to distance themselves from knowledge of their customers' use of their products is simply not credible. Even though the Court concludes Debtors do not share their customers' specific intent to violate the CSA, Debtors certainly know they are selling products to customers who will, and do, use those products to manufacture a controlled substance in violation of the CSA. Debtors tailor their business to cater to those needs, tout their expertise in doing so, and market themselves consistent with their knowledge. There is no evidence this business model has materially changed post-petition.
The Court concludes Debtors' business model and execution thereof fundamentally violates § 843(a)(7). These violations continue post-petition, placing this case squarely within the rule adopted by Judge Tallman in Rent-Rite Super Kegs . To use Judge Tallman's words, even if the Debtors "are never charged or prosecuted under the CSA, [they] are conducting operations in the normal course of [their] business that violate federal criminal law."[165] This Court cannot enforce federal *132 law in aid of the Debtors because Debtors' ordinary course activities constitute a continuing federal crime. The Court finds this is, inescapably, cause to dismiss this bankruptcy case under 11 U.S.C. § 1112(b).
Having reached this conclusion, the Court nevertheless considered whether any alternative to outright dismissal, or other post-petition changes to Debtors' business, could cure the ongoing violations of federal law in this case. However, unlike In re Johnson[166] and In re ARM Ventures, LLC ,[167] the evidence demonstrates extreme improbability the Debtors could survive if they were to sever all ties to their marijuana customers. Debtors' business activities constituting violations of the CSA are a major part of Debtors' ordinary course of business. Whether marijuana-related customers account for 65% or 95% of Debtors' revenue, eliminating all such revenue would be devastating to the Debtors. It is inconceivable Debtors could terminate any sales to known marijuana cultivators and still operate profitably.
In any event, the Court does not believe such an order, or the remediation it would require, would be effective in this case. The Court cannot simply order Debtors to cease all sales to customers known to be involved in marijuana cultivation, because the usefulness of Debtors' products in illegal grow operations will continue to attract marijuana horticulturalists to Debtors' business, including those growing marijuana solely for personal use. Debtors have already acquired a venerable reputation for expertise in hydroponic marijuana growing, and it is difficult to imagine how Debtors could prevent customers from continuing to patronize Debtors' stores because of this reputation. Indeed, the evidence does not show Debtors' essential business model has changed post-petition, which, of course, is the relevant time to determine whether Debtors may remain in bankruptcy. In any event, any such order would require the Court, and interested parties, to monitor the Debtors' sales and customers, which would be very difficult and inefficient. Further, in light of the acrimonious nature of Inniss's relationship with the Debtors, the Court can be reasonably certain such an order would lead to costly and time-consuming future litigation over the Debtors' compliance.
To prevent this Court from violating its oath to uphold federal law, under the specific facts of this case, the Court sees no practical alternative to dismissal.
C. Other Arguments for Dismissal
Inniss raises several further issues allegedly supporting dismissal or abstention. These include Debtors' alleged violations of the Court's cash collateral orders and the two-party nature of the dispute between Debtors and Inniss. Having found cause to dismiss upon the Debtors' continuing violations of the CSA, the Court need not address the remainder of these issues. The Court notes, however, it found the testimony of Debtors' financial advisor, John Thomspon, to be very credible, and the Court likely would have concluded based on Thompson's testimony the Debtors are not violating the Court's cash collateral orders. The Court also notes, having taken judicial notice of the claims registers in this case, this bankruptcy is far from a two-party dispute.
CONCLUSION
A bankruptcy court, as a court of limited and equitable jurisdiction, very rarely finds itself analyzing potential violations of *133 federal criminal law. In this case, such analysis is unavoidable due to the divergence between the non-enforcement of federal marijuana laws. This Court is bound to follow the law as written and may not depart therefrom based on enforcement decisions made by the executive branch.
The result in this case may be viewed by many as inequitable. The Debtors are insolvent, and their business could benefit significantly from reorganization under the Bankruptcy Code. The Debtors likely did not seek bankruptcy relief in bad faith on a subjective standard. But for the marijuana issue, this would be a relatively run-of-the-mill Chapter 11 proceeding. As stated, even following those courts which have crafted alternatives to dismissal when debtors were violating the CSA would produce no practical or efficient alternative to dismissal in this case. At bottom, if the result in this case is unjust, Congress alone has power to legislate a solution.
Ironically, if Inniss, as the party arguing Debtors are violating federal law, wrests control of the Debtors back from Byrd in the State Case, he will almost certainly continue, and perhaps expand, the Debtors' ongoing marijuana-related operations. This irony is not lost on the Court but provides no legal basis for an alternate outcome. The Court casts no aspersions upon the Debtors or their businesses. The result in this case is dictated by federal law, which this Court is bound to enforce.
Accordingly, it is ORDERED the, Court's previous orders for joint administration of Debtors' cases are TERMINATED, the Motion to Dismiss is GRANTED, and Debtors' cases are DISMISSED. All pending motions are DENIED as moot and any scheduled hearings are VACATED.

ECF No. 93 ("Motion to Dismiss ").

ECF No. 122 ("Objection ").

ECF No. 139 ("Reply ").

ECF No. 166 ("Response ").

Exh. E p. 15.

Exh. 3, at ¶ 1.

Exh. 8.

Id. at ¶ 2.2.

Exh. E, p. 11.

Exh. A, ¶ 3.

Case No. 2018CV30331 ("State Case ").

Exh. EE, p. 2.

Id. at p. 11.

See ECF Nos. 151, 244, 333 and 335. Debtors filed a motion to reject the lease for their location in Silverthorne at ECF No. 51, but an order on that motion does not appear on the docket. However, Byrd testified at trial the Silverthorne location has been closed.

ECF No. 336.

Unless otherwise specified, all references herein to "Section," "§," and "CSA" refer to Title 21 U.S.C. § 101, et seq.

The CSA refers to cannabis and marijuana products as "marihuana."

§ 812.

§ 841(a)(1).

§ 843(a)(6) refers to possession of drug manufacturing equipment while § 843(a)(7) refers to distribution of such equipment. As discussed in detail below, the scienter required for conviction under either sub-section is the same.

§ 846.

See Colo. Const., Art. XVIII, Sections 14 and 16 (legalizing marijuana for medical and recreational use, respectively).

Gonzales v. Raich , 545 U.S. 1, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005).

See, e.g., James M. Cole, Deputy Attorney General, Memorandum for All United States Attorneys: Guidance Regarding Marijuana Enforcement (Aug. 29, 2013) (commonly known as the "Cole Memo "); but see Jeffrey B. Sessions, Attorney General, Memorandum for All United States Attorneys: Marijuana Enforcement (January 4, 2018) (revoking Cole Memo).

484 B.R. 799 (Bankr. D. Colo. 2012).

Id.

Id. at 810.

Id. at 806.

Id. at 805.

Id. at 807.

Id. at 811.

514 B.R. 887 (Bankr. D. Colo. 2014).

Id.

Id. at 891.

Id. at 894.

Id.

535 B.R. 845 (10th Cir. BAP 2015)

Id. at 847.

Id. at 849-50.

709 F.2d 1344 (10th Cir. 1983) (the ten factors are "(1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.").

535 B.R. at 852-53.

Id.

Id. at 854.

In re B Fischer Industries, LLC , No. 16-20863-MER, ECF No. 147 (Bankr. D. Colo. Sept. 27, 2017).

Id.

Id.

Id.

Id.

Id.

Id.

Id.

Id.

453 B.R. 770 (Bankr. D. Or. 2011).

Id. at 771.

Id. at 772.

Id. at 773.

No. 10-1181, 2011 WL 5975445 (Bankr. N.D. Cal. Nov. 29, 2011).

Id. at *1.

Id.

Id.

Id. at *2.

Id.

789 F.3d 956 (9th Cir. 2015).

Id. at 959-60.

Id. at 960.

Id.

528 B.R. 178 (Bankr. D. Ariz. 2015).

Id. at 181-82.

Id. at 188.

Id. at 185.

Id.

Id. at 186-87.

Id. at 187-88.

532 B.R. 53 (Bankr. W.D. Mich. 2015).

Id. at 55.

Id. at 56.

Id.

Id.

Id. at 57.

Id.

Id.

Id. at 59.

Id.

564 B.R. 77 (S.D. Fla. 2017).

Id. at 85.

Id. at 86.

Id. at 84.

Id.

Id.

Id. at 86-87.

Id.

No. 17-5516, 2017 WL 3641914 (W.D. Wash. August 24, 2017).

Id. at *1.

Id. at *2.

Id.

Id. at *6.

No. NV-17-1168-LTiF, 2018 WL 989263 (9th Cir. BAP Feb. 5, 2018).

Id. at *1.

Id. at *3.

Id. at *6.

Id.

Id.

Id. at *7.

Id.

21 U.S.C. § 841(a)(1).

United States v. Cooper , 375 F.3d 1041, 1049 (10th Cir. 2004).

United States v. Deiter , 890 F.3d 1203, 1214 (10th Cir. 2018) (quoting Rosemond v. United States , 572 U.S. 65, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014) ).

Deiter , 890 F.3d at 1203 (quoting Rosemond , 572 U.S. at 71, 75-77, 134 S.Ct. 1240 ); see also Nye & Nissen v. United States , 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949) ("[T]o aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." (quotation marks omitted) ); United States v. Rosalez , 711 F.3d 1194, 1205 (10th Cir. 2013) (for an aiding and abetting conviction, the government must prove the defendant "shared in the intent to commit the underlying offense, willfully associated with the criminal venture, and aided the venture through affirmative action" (quotation marks omitted) ).

Rosalez , 711 F.3d at 1205.

Id.

United States v. Isaac-Sigala , 448 F.3d 1206, 1210 (10th Cir. 2006).

United States v. Carter, 130 F.3d 1432, 1441 (10th Cir. 1997) (internal citation and quotation omitted).

U.S. v. Bowen , 527 F.3d 1065, 1078 (10th Cir. 2008) (quoting U.S. v. Pursley , 474 F.3d 757, 759 (10th Cir. 2007) ).

Williams v. Trammell , 782 F.3d 1184, 1192 (10th Cir. 2015).

Id. at 1193 (quoting Wingfield v. Massie , 122 F.3d 1329, 1332 (10th Cir. 1997) ).

Id.

U.S. v. Rufai , 732 F.3d 1175, 1190 (10th Cir. 2013).

No. 15-CV-03630-MEJ, 2016 WL 6473215, at *7 (N.D. Cal. Nov. 2, 2016).

Id. at *1.

Id. at *2.

Id.

Id. at *3.

Id. at *4.

Id. at *7 n.4 (citing Conant v. Walters , 309 F.3d 629, 639 (9th Cir. 2002) (indicating rejection of government's argument that a doctor's "recommendation" of marijuana encourages illegal conduct by the patient) ).

163 F.Supp.3d 821, 823 (D. Colo. 2016).

Id. at 823.

Id. at 823-24.

Id. at 824.

Id.

Id.

Id. at 832.

Id. at 834.

Id. at 835.

Rosalez , 711 F.3d at 1205.

Id.

21 U.S.C. § 843(a)(7).

425 F.3d 1282 (10th Cir. 2005). As discussed supra , the distinction between subsections (a)(6) and (a)(7) has no substantive bearing on the Court's analysis, and therefore Truong's references to sub-section (a)(6) apply equally to the Court's analysis under subsection (a)(7).

Id. at 1284.

Id. at 1289.

Id. (citing United States v. Saffo , 227 F.3d 1260, 1269 (10th Cir. 2000) ).

United States v. Buonocore , 416 F.3d 1124, 1133 (10th Cir. 2005).

Truong , 425 F.3d at 1289.

Id. at 1290.

Id. at 1291.

Id.

Id.

Section 841(c)(2) criminalizes knowingly or intentionally possessing or distributing "a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance ...." The "reasonable cause to believe" standard set forth in § 841(c)(2) uses the exact same language as § 843(a)(6) and (a)(7), and therefore the scienter requirement is the same.

Cf. Truong , 425 F.3d 1282 with U.S. v. Galvan , 407 F.3d 954, 957 (8th Cir. 2005) (rejecting jury instruction that required actual knowledge for conviction under Section 841(c)(2) ), U.S. v. Kaur , 382 F.3d 1155, 1157-58 (9th Cir. 2004) (holding the "reasonable cause to believe" standard of Section 841(c)(2) incorporates both subjective and objective considerations), and U.S. v. Prather , 205 F.3d 1265, 1270 (11th Cir. 2000) ("[T]he jury thus needed to find either that he knew the pseudoephedrine would be used to manufacture methamphetamine or that he had reasonable cause to believe that it would be."). See also U.S. v. Khattab , 536 F.3d 765, 769 (7th Cir. 2008) (discussing circuit split).

746 F.3d 987, 994 n.2 (10th Cir. 2014).

U.S. v. Montgomery , 262 Fed. Appx. 80, 84 (10th Cir. 2008) (unpublished).

The enforcement of federal marijuana laws in the District of Colorado has not materially changed since the Cole Memo was revoked by Attorney General Jeffrey Sessions in early 2018.

Exh. 8, p. 19.

Exhs. 40 and 41.

Byrd later disputed this figure as being closer to 65%.

Exh. 11, p. 1.

Id. p. 2.

Exh. 18; see also Exh. 19 (press release touting advances in marijuana legalization as relating to hydroponics supply industry).

Exh. 24.

Id. p. 12.

Exh. 25 pp. 20-21.

Exh. 59, p. 20.

Exh. 52.

Id.

Id.

Rent-Rite , 484 B.R. at 805.

532 B.R. at 53.

564 B.R. at 77.